[No. S021134. Dec. 26, 1991.]

PACIFIC SOUTHWEST REALTY COMPANY, Plaintiff and Respondent,
v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

**COUNSEL**

De Witt W. Clinton, County Counsel, Halvor Melom and Albert Ramseyer, Deputy County Counsel, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, Edmond B. Mamer and Carol H. Rehm, Jr., Deputy Attorneys General, Louise H. Renne, City Attorney (San Francisco), John J. Doherty and Robin M. Reitzes, Deputy City Attorneys, as Amici Curiae on behalf of Defendants and Appellants.

O'Melveny & Myers, Frederick A. Richman, Gregg A. Oppenheimer and Marcy Jo Mandel for Plaintiff and Respondent.

**OPINION**

MOSK, J.—In 1978 the voters adopted Proposition 13, which provides that until a change in ownership occurs real property may be taxed at no more

than 1 percent of its 1975-1976 assessed value adjusted for inflation. When ownership changes, the property may be reassessed at its current market value. We are asked to decide whether, when a vendor sells a fee simple interest to a purchaser and simultaneously acquires from the latter a leasehold interest in the property, a change in ownership has occurred. We conclude that the California Constitution and implementing statutes compel an affirmative answer to that question, and therefore reverse the judgment of the Court of Appeal.

## I.

The parties have jointly stipulated to the following facts: Under a purchase agreement dated September 28, 1984, plaintiff agreed to convey title to Security Pacific Plaza, an office building complex, "in fee simple absolute" to Metropolitan Life Insurance Company (hereafter Metropolitan Life) for $310 million. The conveyance was made by grant deed recorded the same day. As relevant here, the deed provided that "all of Grantor's right, title and interest" was conveyed, "excepting and reserving to Grantor an estate for years subject to conditions subsequent, upon and subject to all of the terms, covenants, conditions and provisions contained in that certain unrecorded Security Pacific Plaza Office Building Lease of even date herewith."

The purchase agreement set forth the terms of the transaction. One condition precedent to the sale was the execution of the lease, which conveyed an estate for years in two towers constituting 73 percent of the property. Plaintiff was to lease one tower for 60 years, including 10 consecutive renewal options of 5 years each. The term of plaintiff's occupancy of the other tower was 21 months, including a renewal option. The lease permitted Metropolitan Life to raise the rent in accordance with changes in the consumer price index. The lease also gave plaintiff substantial control over the structure, including the exclusive use of the building exterior to display its corporate logo, exclusive use of the cafeteria and helipad, and control over security. The lease required plaintiff to pay its share of the property taxes.

For federal and state income tax purposes plaintiff treated the transaction as a sale, deducting its payments under the lease as business expenses. For the same purposes Metropolitan Life treated the transaction as a purchase, claiming a tax basis in the property equal to the price paid. Metropolitan Life used that tax basis to calculate depreciation deductions, excluding the portion of the purchase price attributable to the land. The parties did not

stipulate whether Metropolitan Life paid the market price for the property, but did stipulate that plaintiff pays rent at the market rate under the lease.[1]

Following the sale, the Los Angeles County Assessor asked the State Board of Equalization (board) for advice regarding the correct method of reassessing the property. The board advised the assessor to reassess only the portion of the property not subject to the lease, and the assessor fixed the valuation at $169,514,243. Seven months later the assessor asked the board to review the transaction anew. Upon reconsideration the board reversed itself, concluding that the sale and leaseback had resulted in a change in ownership of the whole parcel and therefore the property should be reassessed in its entirety. The assessor accordingly raised the valuation to $323 million. Plaintiff paid tax bills pursuant to the increased valuation but applied for a reduction of the assessment, which it later amended into a claim for a refund under Revenue and Taxation Code section 5097, subdivision (b).[2] The board denied the claim without prejudice and plaintiff sought relief in court.

The first amended complaint claimed an improper and illegal assessment on the 1984-1985 and 1985-1986 tax rolls and sought a refund of property taxes and attorney fees. After a hearing the court entered judgment for plaintiff. The court ruled that under the statutes and regulations implementing Proposition 13 plaintiff was entitled to a refund. The Court of Appeal affirmed.

## II.

The essence of Proposition 13 is its provision that all real property in the state shall be taxed at an ad valorem rate not to exceed 1 percent of its full cash value. (Cal. Const., art. XIII A, § 1, subd. (a).) "The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased [or] newly constructed, or [when] a change in ownership has occurred after the 1975 assessment." (*Id.*, § 2, subd. (a).) The only possible adjustment relevant here is for inflation, and that increase may not exceed 2 percent per annum. (*Id.*, § 2, subd. (b).)

Because Proposition 13 did not explicate the meaning of "change in ownership" (*Title Ins. & Trust Co.* v. *County of Riverside* (1989) 48 Cal.3d

---

[1]Because the sale price approximates the assessed value and the rent is at the market rate, we will assume that the purchaser paid the market price for the property. The State Board of Equalization reached a similar conclusion.

[2]Unlabeled references are to this code.

84, 95 [255 Cal.Rptr. 670, 767 P.2d 1148]; *Industrial Indemnity Co. v. City and County of San Francisco* (1990) 218 Cal.App.3d 999, 1004 [267 Cal.Rptr. 445]), it fell to the Legislature to define the phrase, a task it has striven to perform during the 13 years since Proposition 13 was adopted by the electorate. The main effort to create consistent and uniform guidelines to implement Proposition 13's undefined "change in ownership" provision was undertaken by a 35-member panel that included legislative and board staff, county assessors (including defendant), trade associations, and lawyers in the public and private sectors. The panel's work culminated in the Report of the Task Force on Property Tax Administration (hereafter task force report), which was submitted to the Assembly Committee on Revenue and Taxation on January 22, 1979.

As plaintiff notes, the task force recommendations resulted in the enactment of the Revenue and Taxation Code provisions now before us. The Legislature adopted some of the recommendations verbatim or with non-substantive technical revisions, and others with rather minor changes. The report's key change-in-ownership test was adopted verbatim and is now codified as section 60, quoted hereafter.

The task force report drafters stressed the need for uniformity and consistency in the application of section 60's general rule. They stated that they "sought to distill the basic characteristics of a 'change in ownership' and embody them in a single test [now section 60] which could be applied evenhandedly to distinguish between 'changes' and 'non-changes,' both those which the Task Force could and those which it did not foresee. The Task Force was also anxious that the single test be sufficiently consistent with the normal understanding of 'change in ownership' to withstand legal attack." (Task force rep., *supra*, at p. 38.)

The task force "recommends that its general definition of change in ownership (proposed Section 60 Rev & Tax Code) should control *all* transfers, both foreseen and unforeseen. The Task Force also recommends the use of statutory 'examples' to elaborate on common transactions. Lay assessors and taxpayers would otherwise have difficulty applying legal concepts such as 'beneficial use' and 'substantially equivalent.' Thus, common types of transfers were identified and concrete rules for them were set forth in proposed Sections 61 and 62." (Task force rep., *supra*, at p. 40.)

"It is important that the specific statutory examples be *consistent* with the general test," the report drafters explained. "The entire statutory design would be destroyed by providing statutory treatment for specific transfers

which are inconsistent with the general test. In that case, the general test would be overruled by the specific rules and the entire statutory design might be held invalid because of the lack of any consistent, rational interpretation of the constitutional phrase, 'change in ownership.' " (Task force rep., *supra*, at pp. 40-41.)

Because the Legislature, in enacting section 60, adopted its language verbatim after reviewing the task force report, it is evident that the Legislature intended for section 60 to contain the overarching definition of a "change in ownership" for reassessment purposes.

### A. *Application of the Three-part Test*

Section 60's governing test contains three parts: "A 'change in ownership' means [1] a transfer of a present interest in real property, [2] including the beneficial use thereof, [3] the value of which is substantially equal to the value of the fee interest." To determine whether the transaction in the case at bar worked a change in ownership under Proposition 13, we begin with that test. Plaintiff contends the transaction failed to meet any of the three parts of the test. As will appear, however, the transaction met the definition of a change in ownership in all respects.

### 1. *"Transfer of a Present Interest in Real Property"*

Plaintiff maintains that the transaction failed to meet the portion of the test requiring a transfer of a present interest. As will appear, plaintiff's view of the nature of the conveyance is incorrect.

It is undisputed that plaintiff transferred the entire fee to Metropolitan Life. An estate in fee simple is a freehold estate. (Civ. Code, §§ 762, 765.) A freehold estate is distinguished from other forms of estates in that it is of indeterminate duration (*Millsap* v. *Quinn* (Mo. 1990) 785 S.W.2d 82, 84 [appointed officeholder qualification case]; *Board of Transp.* v. *Turner* (1978) 37 N.C.App. 14 [245 S.E.2d 223, 225] ["the true test of a freehold is its indeterminate tenure"]), and carries with it title to land (see *Cohn* v. *Litwin* (1941) 311 Ill.App. 55 [35 N.E.2d 410, 413]). But an estate for years—in this case, a nonperiodic tenancy under a lease—is not a freehold estate. (Civ. Code, § 765.) Indeed, under California law an estate for years is not real property at all but rather a chattel real—a form of personalty—even though the substance of the estate, being land, is real property. (*Id.*, §§ 761, 765; *Dabney* v. *Edwards* (1935) 5 Cal.2d 1, 11 [53 P.2d 962, 103 A.L.R. 822]; see also *Weaver* v. *Superior Court* (1949) 93 Cal.App.2d 729, 734 [209 P.2d 830] ["The sale of a lease for a term of years is not the sale of real

property."]; *Parker* v. *Superior Court* (1970) 9 Cal.App.3d 397, 400 [88 Cal.Rptr. 352, 67 A.L.R.3d 743] [although a leasehold is not real property, it is nevertheless an estate in land].)

Notwithstanding the fact that a lease is a present possessory interest in land, there is no question that as a nonfreehold estate it is a different species of interest from a freehold estate in fee simple. Any other conclusion would be contrary to centuries of English and American common law and its codification, as modified, in our Civil Code. A leasehold is not an ownership interest, unlike the possession of land in fee simple even when encumbered by a mortgage, for in the latter situation the mortgagor acquires equity over time through periodic payments. It is for that reason that common parlance refers to the "owner" of a freehold estate, encumbered or unencumbered, but to the "holder" of a lease; the freeholder is seised of land, whereas the leaseholder is not.

Thus plaintiff's contention that it did not convey a present interest in real property is simply incorrect and cannot forestall a conclusion that a transfer of a present interest in real property occurred. Plaintiff did not retain the same interest when it sold its fee and reserved an estate for years. The entire fee was transferred to Metropolitan Life; the simultaneous creation of a different interest in plaintiff will not defeat the first prong of section 60.[3]

### 2. *"Including the Beneficial Use Thereof"*

The second prong of section 60 requires that to constitute a change in ownership there must be a transfer not only of bare legal title but also of the transferor's beneficial or equitable interest in the land. Plaintiff contends it conveyed no beneficial use of the entire parcel because it continues to enjoy the exclusive use of the portion under its control. We disagree.

---

[3]We note that the definitions of property embodied in the Revenue and Taxation Code prevail for tax purposes even if they are inconsistent with the common law definitions codified in the Civil Code. (*Atlantic Oil Co.* v. *County of Los Angeles* (1968) 69 Cal.2d 585, 594 [72 Cal.Rptr. 886, 446 P.2d 1006].) Thus a leasehold interest, which would be a chattel real under the Civil Code, is treated as real property for tax purposes. (§ 104; *American Airlines, Inc.* v. *County of Los Angeles* (1976) 65 Cal.App.3d 325, 329 [135 Cal.Rptr. 261].) But the Revenue and Taxation Code does not differentiate among estates in land. It should not " 'be presumed that the Legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication.' " (*Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 92 [104 Cal.Rptr. 226, 501 P.2d 234].) Nothing in section 104 establishes that the Legislature intended to overthrow principles of property law dating to the reign of Edward I (1272-1307). Our Civil Code therefore governs this issue.

"The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." (Evid. Code, § 662.) Here, plaintiff has presented no evidence that Metropolitan Life holds title to the property for plaintiff's benefit: there is no evidence showing a custodial or trust relationship, or that plaintiff sold the property for less than essentially the market price. Nor is plaintiff paying below-market rent under the lease; rather, the record reveals the contrary. There can therefore be no question that when Metropolitan Life purchased the property in fee simple absolute it acquired its beneficial use during the lease term.

Metropolitan Life's decision to exercise its beneficial interest by exacting rent from plaintiff rather than acquiring physical control of the demised premises does not alter the character of the transaction. "The fact that [Metropolitan Life] may not occupy the property during the lease period does not deprive it of its right to enjoy the *value* of its property represented by the rent. [Citations.] The sale and leaseback constituted a transfer of the beneficial use of the property within the meaning of section 60." (*Industrial Indemnity Co.* v. *City and County of San Francisco, supra,* 218 Cal.App.3d 999, 1005.) Any other conclusion would ignore the commercial realities of the transaction: as counsel for amicus curiae City and County of San Francisco observed at oral argument, any other interpretation would mean, in the case of a large commercial building, that a change in ownership would rarely occur, for there would usually be tenants remaining in the building. It follows that the second prong of section 60's test was also met at the time of sale.

3. *"The Value of Which Is Substantially Equal to the Value of the Fee Interest"*

The third prong of section 60 requires that the value of the interest transferred be "substantially equal to the value of the fee interest." The facts show this test was met.

Because Metropolitan Life acquired the entire fee, not only did the value of the interest transferred "substantially equal . . . the value of the fee interest," it was of identical value because it was a transfer of the fee itself. (See *Industrial Indemnity Co.* v. *City and County of San Francisco, supra,* 218 Cal.App.3d 999, 1005.) The property sold essentially for the market price, and plaintiff is now paying rent at the market rate. There is no indication that the property would resell for less than the market price. Hence, notwithstanding the reservation of an encumbrance in the form of an estate for years, the value of the transfer equaled that of a conveyance of fee simple.

■  In enacting the third prong of section 60 the Legislature meant to insulate from Proposition 13's effect transfers in which only an estate of lesser value was conveyed. Two examples illustrate the Legislature's intent when it adopted the task force report's findings and enacted the statutory scheme before us.

One example considers the conveyance of a lease for one year. It would not be rational to apply a constitutional provision for reassessment following a "change in ownership" when the owner of an apartment leases it to another for one year, thereby conveying an estate of lesser value than that retained.

By contrast, the Legislature decided, following the task force's recommendation, that the creation of a 35-year lease would achieve a change in ownership (§ 61, subd. (c)(1)) because the length of the lease would give the lessee's interest some of the practical attributes of a conveyance of fee simple. A lease of such duration will constitute the main economic value of the land, even though the leaseholder does not own a freehold estate—lenders are, in the report drafters' view, willing to lend on the security of such an instrument. (See task force rep., *supra*, at pp. 39-41.)

Another example is the conveyance of fee simple from parent to child subject to the reservation of a life estate. The Legislature desired to avoid creating a rule that would characterize such a conveyance as a change in ownership. Because this is a relatively common form of conveyance, the Legislature, again following the task force's recommendation, included it in its list of examples of exempt transfers. (§ 62, subd. (e).) But even if the Legislature had not done so, reassessment would be barred under the carefully drafted basic test of section 60, not only because the beneficial use would not have transferred, but also because the value of each divided interest in the estate would not approach that of a fee. A purchaser of the reserved estate would be buying a life estate *per autre vie*—a freehold estate, to be sure, but an estate of questionable value because subject to complete defeasance at an unknown time. Rare is the mortgagee willing to lend on the security of an estate so ephemeral. The value of the reversionary or remainder interest would also be reduced because the time of vesting would be uncertain and, depending on the care with which the original conveyance was drafted, the value of the ultimate estate might be less at the time of

vesting because of intervening conveyances, creditors' demands, and the like.[4]

By contrast, when the life estate ends and the remainder or reversion indefeasibly vests in the grantees the value of the estate is known and is identical to the value of the fee. It is at that point that a change in ownership has occurred, as the Legislature specifically provided in accord with the task force's recommendation. (§ 61, subd. (f).)

■ As stated above, we find nothing in the nature of the transaction before us to suggest that Metropolitan Life is unable to sell its fee interest in the property to a purchaser for anything less than its full market value. There are no contingent interests that make the value of Metropolitan Life's interest uncertain or questionable. Nor is it likely that Metropolitan Life would have paid substantially the market price for the land if any such contingency had presented itself at the time of the conveyance. We find, therefore, that all prongs of section 60's test have been met, and that the transaction worked a "change in ownership" under Proposition 13.

### B.  Alleged Exemption Under Section 62

It remains to be seen whether the present transaction falls within any item on the list of tax-exempt transfers enumerated in section 62. ■ As we approach this task we pay heed to two precepts that govern interpretation of the statutes at issue: the drafters intended section 62 to provide "examples" of common applications of section 60 rather than exceptions to it (task force rep., *supra*, at p. 40), and therefore our reading of section 62 must be consistent with section 60 (*Industrial Indemnity Co.* v. *City and County of San Francisco, supra*, 218 Cal.App.3d 999, 1006). In light of those precepts, we conclude that no subpart of section 62 exempts the conveyance before us.

### 1.  Transfer of Lessor's Interest in Property Subject to 35-year Lease

■ Subdivision (g) of section 62 provides that a change in ownership does not include "Any transfer of a lessor's interest in taxable real property subject to a lease with a remaining term (including renewal options) of 35 years or more." Plaintiff contends this provision embodies the task force's conclusion that when a lessee has the exclusive right of occupancy for 35 years or more, the lessee and not the lessor is to be treated as the owner for

---

[4]The wording of a grant of a future interest can present pitfalls for the unwary. For an example, see Recent Legislation, *Future Interests: Statutory Abolition of the Doctrine of Worthier Title* (1959) 47 Cal.L.Rev. 740, 741 (discussing Civ. Code, § 1073).

property tax purposes because the value of the estate rests primarily with the former. Hence, in plaintiff's view, no change in ownership occurred.

Two rules of statutory construction guide our inquiry. We look to the plain language of the statute. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) And because sections 60, 61 and 62 are in pari materia, we strive to interpret them in a manner that gives effect to each yet does not lead to disharmony with the other two. (See *Title Ins. & Trust Co.* v. *County of Riverside, supra,* 48 Cal.3d 84, 91; *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].) The rules of statutory construction are not akin to Robert's Rules of Order and we do not apply them hierarchically, but rather to achieve the primary and overriding goal of all statutory interpretation: ascertaining the lawmakers' intent. (See *People* v. *Woodhead, supra,* 43 Cal.3d at p. 1007.) Applying these principles, we conclude that the Legislature did not intend that its rule against finding a change in ownership upon the transfer of a lessor's interest encumbered by a 35-year lease should apply to a sale and leaseback.

We have already observed that the task force decided that the creation, transfer or termination of a leasehold of 35 years or more should achieve a change in ownership because in that case the primary economic value of the land resides in the lease. (See *ante,* p. 165; task force rep., *supra,* at pp. 39-41.) The Legislature followed that recommendation. (§ 61, subd. (c).) By contrast, the Legislature decided that when the remaining term of an existing lease equaled or exceeded 35 years, any transfer of a lessor's interest would be excluded from a change in ownership. (§ 62, subd. (g).)

In the transaction before us there was no existing lease and hence no remaining term. Because section 62, subdivision (g), by its plain language does not apply to the present transaction, our inquiry could end here. (*People* v. *Woodhead, supra,* 43 Cal.3d at p. 1007.) But we believe the better method for extracting the legislative intent is to look to the language and purpose of sections 60, 61, and 62 as a whole. (See *California Mfrs. Assn.* v. *Public Utilities Com., supra,* 24 Cal.3d at p. 844.)

The Legislature's intent is apparent when viewed through the filter of those sections and the task force report. Both the report and the statutes demonstrate that the drafters and the Legislature intended to find a change in ownership when the primary economic value of the land is transferred from one person or entity to another. That general rule applies here. When parties enter into a lease they create the legal relationship that governs their

respective rights in the land, and either's successor in interest will be bound thereby. When the parties are sophisticated commercial entities of the type likely to sign leases for 35 or more years, such leases will often confer substantial rights on the lessee, such as the right to develop or modify capital assets, the long-term use or uses to which the land is to be put, and the like.[5] A long-term lease may also require the lessee to pay property taxes; indeed, the lease here imposes that duty on plaintiff. In sum, the primary economic value of land encumbered by a lease of such duration rests with the lessee; the lessor's rights as a practical matter are limited to receiving rental payments under a relationship the terms of which are fixed by prior agreement for a time substantially equivalent to the duration of a fee.

The Legislature's determination that a change in the lessor under these circumstances will not work a change in ownership is consonant with the concern of the task force report drafters that a transaction should not trigger reassessment unless it transfers the interest of the party carrying the primary economic weight of the property. (Task force rep., *supra*, at p. 40.) Such a determination also comports with commercial reality and public expectations, both subjects of concern to the drafters of the report. (See *id.* at pp. 38, 41, 61.) The mischief a contrary rule could create is evident: for example, a rule permitting reassessment whenever the fee changed hands in land subject to a lease with a remaining term of 35 years could result in an enormous tax increase for a lessee that has erected major capital improvements on the land and whose lease requires the lessee to pay property taxes. The increase could occur merely because the lessor has sold that interest to a third party—a transfer over which the lessee has no control.

The foregoing counterexample is well removed from the reality of the present transaction. Both parties did change their position. No prior agreement bound plaintiff to the terms of a lease of long duration. Plaintiff and Metropolitan Life established their relationship at the time of the conveyance, creating new interests both in plaintiff and in Metropolitan Life. Plaintiff's status changed from freeholder to tenant for years. To apply the rule of subdivision (g) of section 62 to such a transaction would be anomalous indeed: it would contravene the plain language of the code section and would defy Proposition 13's mandate that a change in ownership triggers reassessment of California property. We hold, therefore, that the Legislature did not intend the exception created in subdivision (g) of section 62 to apply to this transaction.

---

[5]"Property types that are typically leased on a long-term basis include banks, supermarkets, restaurants, major drug stores, department stores, and discount stores." (Assessment Practices Survey: A Report on the Assessment of Property that Has Had a Change in Ownership or Control" (1984) Assessment Standards Div., Property Taxes Dept., Cal. State Bd. of Equalization, p. 10.)

### 2. *Reservation of an Estate for Years*

■  Subdivision (e) of section 62 provides that a change in ownership does not include "Any transfer by an instrument whose terms reserve to the transferor an estate for years or an estate for life; however, the termination of such an estate for years or estate for life shall constitute a change in ownership, except as provided in subdivision (d) and in Section 63." Calling to our attention the language of the purchase agreement, which specifically "except[s] and reserv[es]" from the property to be conveyed to Metropolitan Life "an estate for years on the terms and conditions set forth in the Office Building Lease," plaintiff argues that subdivision (e) of section 62 exempts the conveyance at bench from reassessment.

We cannot agree. Although plaintiff's interpretation arguably comports with the language of the code provision, it disregards other pertinent sections of chapter 2 of part 0.5 of division 1 of the Revenue and Taxation Code.

As we have already observed, code sections in pari materia must be harmonized with each other to the extent possible; a section should be construed in light of the whole system of law of which it is a part. (*People* v. *Comingore* (1977) 20 Cal.3d 142, 147 [141 Cal.Rptr. 542, 570 P.2d 723]; see *Moore* v. *Panish* (1982) 32 Cal.3d 535, 541 [186 Cal.Rptr. 475, 652 P.2d 32].)

Considered in isolation, we might agree with plaintiff that the language of subdivision (e) of section 62 appears to confer an exemption from reassessment, for it provides that "*Any* transfer by an instrument whose terms reserve to the transferor an estate for years" shall not work a change in ownership. (Italics added; see *Title Ins. & Trust Co.* v. *County of Riverside, supra*, 48 Cal.3d 84, 93-94 ["Statutes often use the word 'any' to designate all those referred to . . . ."].)

But we have already explained that the transaction did achieve a change in ownership within the meaning of section 60, which was intended as the fundamental rule implementing Proposition 13. As we have also observed, the report drafters declared their intention that the examples set forth in sections 61 and 62 were to be derivative or explanatory, and not to conflict with section 60's general rule. (Task force rep., *supra*, at p. 40.) We therefore conclude that the Legislature did not intend for a sale and leaseback to fall within the ambit of section 62, subdivision (e). Any other conclusion would render meaningless the preeminent command of section 60—a result we are constrained to avoid. Moreover, we find support for our conclusion in the task force report.

The report originally proposed the following language for subdivision (e) of section 62: "(e) *Retained Life Estates.* Any transfer in which the transferor retains beneficial use of the property for his lifetime." (Task force rep., *supra*, at p. 51.) As codified, however, the subdivision exempts "Any transfer by an instrument whose terms reserve to the transferor an estate for years or an estate for life . . . ." We believe the evolution of the provision explains the Legislature's intent as clearly as possible given the sparse legislative history.

The drafters were concerned that individuals who proposed to convey title to property to others but retain the beneficial use of that property not have a change in ownership forced upon them while they retained the beneficial use and thereby the "dominant or primary [economic] interest . . . ." (Task force rep., *supra*, at p. 44.) A contrary rule would frustrate the intent of the voters, who adopted Proposition 13 in part out of concern that high property tax rates were burdening senior citizens and others whose home values had soared but whose incomes were fixed. (See Sears, Tax Revolt: Something for Nothing in California (1982) p. 122.)

Of course, a conveyance of fee simple with a reserved life estate is a common means for parents to convey property to children. But the Legislature was apparently also mindful of the desire of some parents to convey a remainder or reversionary interest to their children to vest at adulthood, at an age of greater maturity (e.g., 35 years), or, as suggested at oral argument, upon the planned retirement of the fee owner. The reservation of a life estate would not serve the transferor's goals if the intent was to convey property in this manner, but the reservation of an estate for years in the transferor would accomplish that end. It is therefore not surprising that the Legislature added the phrase "estate for years" to subdivision (e) of section 62; and it is equally unsurprising that the "beneficial use" language in the task force's proposed subdivision disappeared from the codified version, because section 60 includes that language, making its repetition superfluous. Construing subdivision (e) of section 62 to provide an exemption from the general rule of section 60 when the transferor retains the beneficial use of the property during the transferor's life or for years harmonizes those two sections and meets the voters' and the Legislature's apparent intent. We therefore adopt that construction.

It is immediately evident that the transaction before us does not fall within the exemption set forth in subdivision (e) of section 62 as we have construed it. Plaintiff did not retain a beneficial use of the property for itself; it pays rent to Metropolitan Life, which enjoys the entire beneficial interest in the

property. Therefore, we cannot apply the rule of subdivision (e) of section 62 to provide the relief plaintiff seeks.

### 3. *Effect of Pertinent Regulation*

For the foregoing reasons we also cannot accept plaintiff's view of the effect of section 462, subdivision (k)(4) of title 18 of the California Code of Regulations. That administrative rule provides: "Sale and leaseback. A sale of real property, coupled with a leaseback which is not reserved to the transferor by the terms of the sale instrument, constitutes a change in ownership of such property; provided however, a sale and leaseback transaction shall be rebuttably presumed to be a non-reappraisable financing transaction upon a proper written showing [that the transaction is a financing for income-tax purposes]." As plaintiff was constrained to concede at oral argument, an administrative rule that exceeds the Legislature's grant of authority as expressed in section 60 et seq. is without effect and may not be enforced. (See *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 176, fn. 3 [70 Cal.Rptr. 407, 444 P.2d 79]; *University Ford Chrysler-Plymouth, Inc.* v. *New Motor Vehicle Bd.* (1986) 179 Cal.App.3d 796, 805 [224 Cal.Rptr. 908].) Therefore, to the extent the regulation conflicts with the Constitution and the Revenue and Taxation Code as construed in this opinion, well-settled principles of administrative law proscribe its enforcement.[6]

The judgment of the Court of Appeal is reversed with directions to order the trial court to enter judgment for defendants.

---

[6]Plaintiff observes that the Legislature passed a bill that would have provided explicitly that the exemption in subdivision (e) of section 62 does not apply "to the transfer of a present interest . . . coupled with or conditioned upon a lease of the property from the transferee to the transferor." (Assem. Bill No. 2528 (1985-1986 Reg. Sess.) § 1.) The Governor vetoed the bill because it might "require a reassessment of property when there has not been a transfer of a present beneficial use of a property to the transferee equivalent to a fee estate." (Governor's Veto Message to Assem. on Assem. Bill No. 2528 (Sept. 26, 1986) 6 Assem. J. (1985-1986 Reg. Sess.) p. 10140.) But we have explained that the transaction at bar did transfer beneficial use to Metropolitan Life. Moreover, the passage of this bill sheds little light on the Legislature's original intent in enacting subdivision (e) of section 62, particularly when, as here, the Legislature specified in the bill that the amendment did not purport to reflect on the effect of the original legislation. The legislation stated, "it is not the intent of the Legislature in enacting this act to express its opinion regarding the past state of the law on the subject of their [*sic*] transfers or to prejudice the merits of any litigation involving the proper interpretation of Section 62 of the Revenue and Taxation Code for any period prior to the effective date of this act." (Assem. Bill No. 2528 (1985-1986 Reg. Sess.) § 2.)

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and Lillie, J.,* concurred.

Respondent's petition for a rehearing was denied February 20, 1992. George, J., did not participate therein.

---

*Presiding Justice, Court of Appeal, Second Appellate District, Division Seven, assigned by the Chairperson of the Judicial Council.