Filed 9/26/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RICHARD N. BENSON, as Assessor-Recorder, etc.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MARIN COUNTY ASSESSMENT APPEALS BOARD,<br><br>    Defendant;<br><br>JAMES D. MIKKELSEN,<br>    Real Party in Interest and Respondent. | A134340<br><br>(Marin County Super. Ct.<br>No. CV 1003775) |

## I. INTRODUCTION

Under article XIII A of the California Constitution (popularly known as Prop. 13), the most common trigger of the reassessment of real property is a "change in ownership." The initiative measure, itself, did not define change in ownership, leaving that task to the Legislature, which promptly appointed a task force to make recommendations. At the time the initiative measure was approved by California voters, joint tenancies were commonly used as an estate planning tool—parents would deed property to themselves and their children so it would pass automatically to the latter upon the death of the last surviving parent. The task force therefore proposed treating "family" joint tenancies akin to the making of a will. Since there is no change in ownership on the mere making of a will, there similarly would be no change in ownership on the creation of a family joint tenancy. Rather, change in ownership would occur when the joint tenancy terminated, frequently on the death of the last surviving parent. The Legislature adopted the task

1

force's recommendations, and the Legislature and the State Board of Equalization have spent the ensuing decades refining the notion that there is no change in ownership when a family joint tenancy is created, but there is on termination.

In this case, after one of two brothers inherited a residential property from their mother, he created a joint tenancy with his brother. Nearly a decade later, the second brother deeded his own joint tenancy interest to himself as a tenant in common with his brother. Although he and his brother continued to own the property and retained the same percentage ownership as before, the Marin County Tax Assessor determined a change in ownership had occurred, reassessed the property and sent the second brother, real party in interest James Mikkelsen, a tax bill. Mikkelsen appealed to the Assessment Appeals Board, claiming a mere change in the way title was held was not a change in ownership. The Board agreed with Mikkelsen. The Assessor sought a writ of review from the trial court. The court also agreed with Mikkelsen. The Assessor now appeals to this court, supported by the State Board of Equalization as amicus curiae.

As Mikkelsen points out, the Legislature has, indeed, specified a mere change in the way title is held is not a change in ownership when it comes to most property, and there certainly is logic to that approach. However, as we will explain, from the time the Legislature enacted the change in ownership statutes implementing Proposition 13, it has treated family joint tenancies differently. While the wisdom of the policy reason for that differential treatment—to accommodate the use of joint tenancy as an estate planning tool—may be a matter of debate, it was within the Legislature's prerogative to craft the change in ownership statutes accordingly. What Mikkelsen, the Board and the trial court overlooked was that Mikkelsen got the advantage of this policy when his brother created the joint tenancy and no change in ownership was deemed to have occurred. The price for that property tax break, so to speak, was a change in ownership when the family joint tenancy was terminated. We therefore reverse the judgment of the trial court.

## II. FACTUAL AND PROCEDURAL BACKGROUND

When Peter and James Mikkelsen's father died in the mid 1950's, he left a home in Mill Valley to their mother, Dagmar Mikkelsen. She subsequently created a joint

2

tenancy in the property with Peter. When Dagmar died in July, 1997, Peter became the sole owner of the property by right of survivorship. In December, Peter created a joint tenancy in the property with James. As a result, each had a 50 percent undivided interest in the property and reciprocal rights of survivorship. The brothers owned the home as joint tenants for a decade. In November 2007, James "severed his interest as a joint tenant" by executing and recording a grant deed wherein he granted "to himself an interest as a tenant in common."

The Marin County Assessor determined James' transfer of his joint tenancy interest to himself as a tenant in common, was a change in ownership triggering reassessment under Proposition 13. The assessed value of the property was determined to be $525,323, significantly higher than its previously assessed value of $100, 631 and resulting in a tax increase of $2,682.84.

James challenged the reassessment and sought a tax refund, on the ground, inter alia, the change in legal title from joint tenancy to tenancy in common did not constitute a change in ownership. The Assessor rejected his challenge. James appealed to the Assessment Appeals Board for Marin County. By a vote of two to one, the Board reversed the Assessor's decision and returned the property's assessed value to $100,631. The Assessor petitioned the Marin County Superior Court for a writ of review of the Board's decision, which the court denied. The Assessor timely appealed to this court.

### III. DISCUSSION

Proposition 13 specifies: "The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property." (Cal. Const. art. XIII A, § 1, subd. (a).) The measure defines "full cash value" to mean "the appraised value of real property when purchased, newly constructed, or *a change in ownership* has occurred after the 1975 assessment." (Cal. Const. art. XIII A, § 2, subd. (a), italics added.) Of the three "value benchmarks under Proposition 13" (i.e., the 1975 base, change in ownership, and new construction), change in ownership is "by far the most important, as it is the primary reappraisal 'trigger' under Article XIII A." (Assem. Revenue and Taxation Com., Rep. of the Task Force on Property Tax Administration

3

(January 22, 1979) (Task Force Report), p. 37.)  It thus is no surprise that "[t]he most complex area of law implementing Proposition 13 is the attempt to define 'change in ownership.' "  (Assem. Revenue and Taxation Com., Rep. of the Implementation of Proposition 13, Vol. 1, Property Tax Assessment (October 29, 1979) (Implementation Report), p. 18.[1])

### *Statutory Definition of "Change in Ownership"*

"Proposition 13 did not explicate the meaning of 'change in ownership.' " (*Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 161 [2 Cal.Rptr.2d 536, 820 P.2d 1046] (*Pacific Southwest*).)  That task was left to the Legislature which, "the year after article XIII A's passage, . . . adopted a statutory framework for implementing it."  (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1321 [104 Cal.Rptr.3d 195, 223 P.3d 57]; see also *Pacific Southwest, supra,* 1 Cal.4th at pp. 160–161.)  It was understood this initial legislation, enacted through Senate Bill No. (SB) 154, would be followed by more extensive legislation.  (See Implementation Report, p. 18.)

#### *The Task Force Report*

As a prelude to drafting the more comprehensive legislation, the Legislature appointed a 35-member Task Force consisting of "legislative and board staff, county assessors . . . , trade associations, and lawyers in the public and private sectors" to "create consistent and uniform guidelines to implement Proposition 13's undefined 'change in ownership' provision."  (*Pacific Southwest, supra*, 1 Cal.4th at p. 161.)  The Task Force's report became the blue print for the legislation.  (*Id.* at p. 162.)

With respect to the term "change in ownership," the Task Force "sought to distill the basic characteristics of a 'change in ownership' and embody them in a single test which could be applied evenhandedly to distinguish between 'changes' and 'non-changes.' "  (Task Force Report, p. 38; *Pacific Southwest Co., supra*, 1 Cal.4th at p. 161.)

---

[1] Pursuant to the Assessor's and State Board of Equalization's request, we take judicial notice of both the Task Force Report and Implementation Report.  (Evid. Code, §§ 452, subd. (h), 459.)

The Task Force was also anxious the test be sufficiently consistent with "normal understanding of 'change in ownership' to withstand legal attack." (Task Force Report at p. 38; *Pacific Southwest, supra*, 1 Cal.4th at p. 161.)

The Task Force concluded the essence of a change in ownership "is a transfer which has all three of the following characteristics: [¶] 1. It transfers a present interest in real property; [¶] 2. It transfers the beneficial use of the property; and [¶] 3. The property rights transferred are substantially equivalent in value to the fee interest." (Task Force Report, p. 38, emphasis omitted.) The Task Force envisioned this proposed definition would "control all transfers, both foreseen and unforeseen" and recommended "the use of statutory 'examples' to elaborate on common transactions." (Task Force Report at p. 40, emphasis omitted.)

With respect to co-tenancies, the Task Force stated: "Tenancies-in-common and joint tenancies create undivided interests in land, with each co-tenant owning a percentage (fractional) interest. Transfer of any fractional interest is a change of ownership, but results in reappraisal ONLY of the percentage interest transferred. [¶] Unfortunately, such treatment imposes a new administrative burden on assessors. It requires them to keep separate accounting records and base year values for the fractional interests which are created or transferred at different times. The Task Force saw no means of avoiding the new burden altogether, but did its best to minimize the burden. [¶] Under the Task Force recommendations separate accounting is not required for 'family' joint tenancies, which are the great majority of joint tenancies in this state. Thus the new burden on assessor's [*sic*] is limited only to co-tenancies which don't fit under the 'family' joint tenancy rule and are not interspousal co-tenancies. That group of co-tenancies should not be numerous." (Task Force Report at pp. 41–42.)

As to "family" joint tenancies, the Task Force explained: "Probably the vast majority of joint tenancies in California (other than interspousal joint tenancies) are those in which a parent places his property in joint tenancy with children. The special aspect of a joint tenancy (as distinguished from tenancy-in-common) is that the surviving joint tenant (or joint tenants) succeeds to the entire property *by operation of law on the death*

5

*of the other joint tenant.* For that reason joint tenancy is often used as a substitute for a will. The same consideration which justifies excluding the making of a will from change in ownership also supports exclusion of the <u>creation</u> of a joint tenancy where the transferor (e.g., parent) is one of the joint tenants. The rights of the new joint tenants (e.g., the children) to obtain the entire property outright are contingent upon their surviving the transferor joint tenant. Creation of such joint tenancies is not a change in ownership, but the entire property is reappraised when the joint tenancy terminates. Again, fractional accounting and reappraisal by the assessor is avoided. [¶] The rule recommended by the Task Force is general; it covers any joint tenancy created by a person who, after the creation of the joint tenancy, is one of the joint tenants, whether or not it is a parent-child joint tenancy. However, most such joint tenancies are created within a family." (Task Force Report at pp. 42–43.)

### *The Comprehensive Legislation (1979 c. 242 AB 1488)*

The recommendations of the Task Force were originally incorporated into Assembly Bill No. (AB) 156, which was vetoed by the Governor on June 9, 1979. In response to the Governor's veto message, a new bill, AB 1488, made some changes, not relevant here, but otherwise included the provisions of AB 156. (Assembly Revenue and Taxation Committee Enrolled Bill Analysis of AB 1488, as amended June 28, 1979, p. 1.) The Governor approved the revised legislation on July 10, 1979.

The legislation enacted through AB 1488 dwarfed the initial stop-gap legislation that had been enacted through SB 154. "As the myriad of complexities involving property transfer rapidly became apparent, the resulting text of the 1979 law grew and grew, ultimately to nearly six times the size of the SB 154 law of 1978." (Implementation Report at p. 18.)

The Legislature adopted the Task Force's proposed definition of "change in ownership" as section 60 of the Revenue and Taxation Code. (Rev. & Tax. Code, § 60.)[2] "Because the Legislature, in enacting section 60, adopted its language verbatim after

_____

[2] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

6

reviewing the task force report, it is evident that the Legislature intended for section 60 to contain the overarching definition of a 'change in ownership' for reassessment purposes." (*Pacific Southwest, supra*, 1 Cal.4th at p. 162.)

The Legislature adopted the Task Force's proposed "statutory examples" as section 61 (illustrative of transfers constituting a change in ownership) and section 62 (illustrative of transfers not constituting, or excluded from, a change in ownership). (§§ 61–62; Task Force Report at pp. 49–54; see also *Pacific Southwest, supra*, 1 Cal.4th at p. 162.)

With respect to joint tenancies, section 61, subdivision (d), provided that the "creation, transfer or termination of any joint tenancy interest, except as provided in subdivision (f) of Section 62 and in Section 63" *did* constitute a change in ownership. (Stats. 1979, ch. 242, § 4, p. 510 (A.B. 1488); see Task Force Report at p. 49.) Section 62, subdivision (f), in turn, provided that the "creation or transfer of a joint tenancy interest if the transferor, after such creation or transfer, is one of the joint tenants" did *not* constitute a change in ownership. (Stats. 1979, ch. 242, § 4 p. 510 (A.B. 1488); see Task Force Report at p. 51.) Section 65 spelled out the extent to which joint tenancy interests would be reassessed on termination. (Stats. 1979, ch. 242, § 4, p. 510 (A.B. 1488); see Task Force Report at p. 54.)[3]

### *The Cleanup Legislation (Stats. 1979, c. 1161, AB 1019)*

Almost as soon as AB 1488 was passed, it became apparent the legislation needed to be massaged, and the Legislature did so through AB 1019.

Pertinent to this case, section 65 was amended to make clear no change in ownership (and no reassessment) would occur when an "original joint tenant" terminated his or her interest if the interest was transferred to "the <u>remaining</u> joint tenants or the <u>spouse</u> of the original joint tenant." (Sen. Republican Caucus, analysis of Assem. Bill

---

[3] While the Task Force had recommended the entirety of a joint tenancy property be reassessed on the termination of any joint tenancy interest, the Legislature, in section 65, provided for only partial reappraisal. (Stats. 1979, ch. 242, § 4, p. 510 (A.B. 1488); see Task Force Report at p. 54.)

No. 1019 (1979–1980 Reg. Sess.) as amended Sept. 7, 1979, p. 2.)[4]  "The bill . . . [¶] . . . [¶] . . . revises joint tenancy provisions of AB 1488 to:  [¶] [p]rovide that no reappraisal occurs when an original joint tenant terminates his/her interest, if such interest vests in the <u>remaining</u> joint tenants.  Reappraisal occurs only upon the complete turnover of all original owners, ('original transferors'), or if an interest is transferred to a new party, and not to the remaining present joint tenants.  (65(a) R & TC)."  (Assemblyman Thomas M. Hannigan, letter to Governor Edmund G. Brown, Jr., September 20, 1979, pp. 1–2.)  Or, as the State Board of Equalization explained:  The revision of "AB 1488 provides that reappraisal occurs only upon the *complete turnover* of all the original owners or the termination of the interest of the last remaining original transferor, and does not result in a reappraisal if the property is transferred to the remaining joint tenants."  (State Bd. of Equalization, letter to Governor Edmund G. Brown, Jr. re Assem. Bill No. 1019 (1979–1980 Reg. Sess.) Sept. 20, 1979, p. 2, italics added.)

Collectively, Assembly Bill Nos. 1488 and 1019 worked a significant change in the way joint tenancies were treated for purposes of reassessment.  As the Implementation Report explained:  "The 1979 legislation of AB 1488 and AB 1019 represents a complete turnaround in the treatment of joint tenancies and undivided interests, from that of SB 154.  For 1978–1979 [pursuant to SB 154], the <u>creation</u> of a joint tenancy was the trigger for reappraisal, while any termination of a joint tenancy interest was <u>not</u> a change in ownership. . . .  [¶] However, the Task Force found the SB 154 treatment to be exactly backward.  It reasoned that joint tenancy confers some rights in both joint tenants while they are both alive, but the most meaningful of ownership rights—complete fee title to the whole property—would occur on the termination of the joint tenancy, such as the death of one of the joint tenants.  That right, like rights under a will or intervivos trust, is contingent upon survivorship.  Thus, the first exclusion to the general rule under present law [defining change in ownership] is for any creation or

---

[4]  In accordance with Evidence Code sections 452, subdivisions (a) and (c) and 459, we take judicial notice of the legislative history of the relevant statutes on our own motion.

transfer of a joint tenancy interest where the transferor <u>remains</u> as one of the joint tenants after the transaction (Section 62(f)).  The termination of a joint tenancy interest, however, <u>is</u> generally deemed a change in ownership, which is the reverse of the earlier policy."[5] (Implementation Report at pp. 20–21.)

The Implementation Report also discussed the new concept of "original transferors," pivotal to the new view that creation of a joint tenancy would not constitute a change in ownership, but termination would.  "In determining whether a joint tenancy transaction constitutes a change in ownership, and if so the extent to which the property would be reappraised, AB 1488 introduced and AB 1019 refined the concept of an 'original transferor'.  [¶] An 'original transferor' is one or more persons who hold joint tenancy interests in property immediately after a complete turnover of the <u>previous</u> original owners occurs. . . .  After the point in time at which the original ownership is established, no subsequent joint tenants who are added to the current ownership (except the spouses just mentioned) are treated as 'original transferors'  (Section 65(a))." (Implementation Report at p. 21.)  The Report then elaborated on various kinds of transfers by and between joint tenants and the consequence in terms of reappraisal. (Implementation Report at pp. 22–23.)

---

[5]  The report also explained:  "[T]here are two other major exceptions [to the general rule] where a joint tenancy transaction is NOT a change in ownership:  [¶] (1) Any termination of an 'original transferor's interest', IF that interest [is] transferred (a) <u>by</u> <u>operation</u> <u>of</u> <u>law</u>, i.e., upon death,  and (b) in whole or in part to the remaining original transferor(s)  (Section 65 (a)(1)).  However, if the transfer is intervivos, or wholly to a non-original transferor, or there are no remaining original transferors, then the ENTIRE portion of the property held by that original transferor PRIOR to the creation of the joint tenancy will be reappraised.  [¶] (2) Any termination of the joint tenancy interest of OTHER than an original transferor, IF the interest is transferred to an original transferor or else to all remaining joint tenants (Section 65(a)(2)).  If that interest goes in whole or in part to a NEW party beyond the current joint tenants (including original transferor(s)), then a change in ownership DOES occur, and a reappraisal will be made of the proportional interest transferred, in accordance with the general rule." (Implementation Report at pp. 21–22.)

"This rather complex treatment," the Implementation Report explained, was "designed to protect family joint tenancy interests, and those of original owners." (Implementation Report at p. 22.)

### Subsequent Legislative Refinement

In 1980, the Legislature continued to refine the change in ownership statutes by enacting several bills, including SB 1260, which revamped section 65, pertaining to joint tenancies. (Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 1260 (1980 Reg. Sess.) as amended Aug. 26, 1980, p. 2.) "Sections 61, 62 and 65 with respect to joint tenancy interests generally are re-written to consolidate and clarify such language in Section 65." (Assem. Revenue and Taxation Com., Rep. on Sen. Bill No. 1260 (1980 Reg. Sess.) as amended May 28, 1980, p. 1; accord, State Bd. of Equalization, letter to Governor Edmund G. Brown, Jr., re. Sen. Bill No. 1260 (1980 Reg. Sess.) Sept. 17, 1980, p. 2 [section 65 was "completely rewritten in SB 1260 to clarify the treatment of joint tenancies"].)

"Specifically, intervivos transfers among the 'original transferors' do not trigger reappraisal. . . . Further, it is clarified that the transfer of an interest by the last surviving original transferor results in reappraisal of the entire property interest held by the original transferors." (Assem. Revenue and Taxation Com., Rep. on Sen. Bill No. 1260 (1980 Reg. Sess.) as amended May 28, 1980, p. 1.) The legislation also made clear "the transfer of an interest by the last surviving original transferor results in reappraisal of the entire property interest held by the original transferors." (*Ibid.*) "Original transferors," explained the Assembly Revenue and Taxation Committee Report, are "persons who transfer property into joint tenancy. So long as they are part of the chain of ownership there will be no reappraisal. Once the original transferor's interests are transferred, the entire property is reappraised. Thus, partial reappraisals are avoided during the term of the joint tenancy. This scheme has some administrative advantages, and while there will be fewer reappraisals in the short run, the total property will have a higher reappraisal when the term of the original transferors is terminated." (Douglas D. Bell, Executive Secretary, letter to Governor Edmund G. Brown, Sept. 17, 1980, p. 3.)

10

In 1988, additional technical corrections were made to section 65 to clarify that "a termination of an interest in a joint tenancy is excluded from change in ownership only if an original transferor is still among the joint tenant." (Legis. Analyst, analysis of Sen. Bill No. 569 (1987–1988 Reg. Sess.) as amended May 23, 1988, p. 2.)

### State Board of Equalization Regulations

The State Board of Equalization is charged with promulgating rules and regulations to ensure statewide uniformity in appraisal practices. (Gov. Code, § 15606.) To this end, the Board has promulgated regulations (Cal. Code Regs., tit. 18, § 462.040) and published annotations of its opinion letters[6] on the reassessment and taxation of joint tenancies. The Board's interpretation of the statutes it is charged with implementing is generally entitled to significant deference. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 490 [80 Cal.Rptr.3d 28, 187 P.3d 888]; *Yamaha, supra,* 19 Cal.4th at p. 7.)

Since the passage of Assembly Bill Nos. 1488 and 1019 in 1979, the Board has consistently treated family joint tenancies in the manner discussed above—that is, that the *creation* of a family joint tenancy does not result in a change in ownership, but *termination* of such a joint tenancy does. The Board's implementing regulations require such treatment of a family joint tenancy. (Cal. Code Regs., tit. 18, § 462.040, subd. (b).) Likewise, in annotations of its opinion letters, the Board has consistently explained that while the creation of a family joint tenancy does not constitute a change in ownership triggering reappraisal, termination of such a tenancy does. (E.g., Property Tax Annotations, Annotation 220.0295, Joint Tenancy (April 15, 1987); Property Tax

---

[6] "For more than 40 years, the State Board of Equalization (Board) has made available for publication as the Business Taxes Law Guide summaries of opinions by its attorneys of the business tax effects of a wide range of transactions. Known as 'annotations,' the summaries are prompted by actual requests for legal opinions by the Board, its field auditors, and businesses subject to statutes within its jurisdiction. The annotations are brief statements—often only a sentence or two—purporting to state definitively the tax consequences of specific hypothetical business transactions." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 4–5 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).)

Annotations, Annotation 220.0298, Joint Tenancy (Sept. 11, 1985).) In fact, Annotation 220.0298 addresses a situation analogous to that here. Explaining that a mother's creation of a joint tenancy with her son would not constitute a change in ownership, the annotation states a subsequent change to holding title as tenants in common would effect a change in ownership for purposes of reassessment. (Property Tax Annotations, Annotation 220.0298, Joint Tenancy ["If the joint tenants later take title to the property as tenants in common, there is a change in ownership of the 50 percent undivided interest in the property acquired by the son."][7]; see also Property Tax Annotations, Annotation 220.0305, Joint Tenancy (Jan. 19, 1994) [husband's and wife's recording document that their joint tenancy interests were held as community property resulted in third joint tenant's interest becoming a tenancy in common, constituting a change in ownership unless an exclusion, such as parent-child exclusion, applied][8]; Robert W. Lambert, Tax Counsel for State Bd. of Equalization, opinion letter, May 24, 1999 [discussing effect of spouse's death on a joint tenancy that included a child, and subsequent deed from widower to himself as the beneficiary and a widower; the latter terminated the joint tenancy between the surviving parent and child, resulting in a tenancy in common, and constituted a change in ownership].)

The Board is also called upon to provide instructions to county assessors in connection with the classification, assessment and taxation of property, and does so, in part, by way of "Letters to Assessors" (LTA's). (Gov. Code, § 15606, subds. (e)–(f).) LTA No. 81/56, dated April 17, 1981, provided a "Quick Reference Chart" as a tool to

---

[7] Property Tax Annotations, Annotation 220.0298, Joint Tenancy summarizes the Board's September 11, 1985, response to an inquiry about the consequences of mother and son terminating their joint tenancy and becoming tenants in common. (Barbara G. Elbrecht, Tax Counsel for the State Bd. of Equalization, letter dated Sept. 11, 1985.)

[8] Property Tax Annotations, Annotation 220.0305, Joint Tenancy summarizes the Board's January 19, 1994, response to an inquiry about the consequences of a parents' community property statement on a joint tenancy with their child. (Luma Serrano, State Bd. of Equalization, mem. to Verne Walton, Division of Assessment Standards, Jan. 19, 1994.)

help local assessors identify changes in ownership.[9] One example was a joint tenancy that included an original transferor. Upon creation of the joint tenancy there would be no change in ownership, but on change to a tenancy in common, there would be. (State Bd. of Equalization Letters to County Assessors No. 81/56 (April 17, 1981).) This example was repeated in LTA No. 83/39. (State Bd. of Equalization Letters to County Assessors No. 83/39 (March 18, 1983.)

### *The Statutes Are Interrelated and Implement the Legislature's Intent*

Mikkelsen contends that under the general definition of change in ownership set forth in section 60, no change in ownership occurred when he terminated his joint tenancy and created a tenancy in common. He maintains there was no transfer of any "present interest" in the property (including the beneficial use thereof), and asserts section 60 is controlling and the other statutory provisions pertaining to change in ownership are subordinate to it.

While Mikkelsen is correct that section 60 reflects the Task Force's effort to articulate a general definition (Task Force Report at p. 38), and the Legislature adopted the proposed language (see *Pacific Southwest, supra,* 1 Cal.4th at p. 162), the extensive legislative history makes clear section 60 does not stand alone and the other statutes pertaining to change in ownership further explicate what constitutes a change in ownership. Sections 61 and 62, for example, set forth the myriad examples the Task Force provided to more concretely define change in ownership. (Task Force Report at pp. 49–54.) These two statutes, as we have discussed, along with section 65, specifically address family joint tenancies. (§§ 61, subd. (d), 62, subd. (f), 65.) Moreover, given the detailed discussion of these joint tenancies in the Task Force Report and the Implementation Report (Task Force Report at pp. 41–43; Implementation Report, pp. 21–23), as well as in the legislative history of the subsequent retooling of section 65 (e.g., Letter to Governor (Sept. 17, 1980), p.2), there can be no question the Legislature

---

[9] Pursuant to Assessor's and State Board of Equalization's request, we take judicial notice of the Board's LTA's pertaining to family joint tenancies. (Evid. Code, §§ 452, subd. (h), 459.)

intended that the complement of these statutes, and not section 60, alone, defines when a change in ownership occurs.

Accordingly, we do not agree with Mikkelsen's view that no transfer of a "present interest" for purposes of section 60 occurred on the termination of his joint tenancy and creation of a tenancy in common. What the Task Force, and in turn the Legislature, meant by that phrase is fleshed out in sections 61, 62 and 65. (Task Force Report at p. 40 [statutory examples set forth in sections 61 and 62 "elaborate" on the meaning of change in ownership, providing guidance as to "common transactions"].) Moreover, what the Task Force was particularly concerned about in connection with "present interests" was protecting purely contingent or inchoate transfers from reassessment. (Task Force Report at pp. 37–40.) Mikkelsen's termination of his family joint tenancy interest and creation of a tenancy in common was not such an ephemeral transfer.

### *Change in method of holding title exception*

Mikkelsen, the Assessment Appeals Board and the trial court also focused on section 62, subdivision (a), which provides in pertinent part: "Change in ownership shall not include: [¶] (a)(1) Any transfer between coowners that results in a change in the method of holding title to the real property transferred without changing the proportional interests of the coowners in that real property, such as a partition of a tenancy in common." (§ 62, subd. (a)(1).) As Mikkelsen points out, the term "coowners" can embrace joint tenants, as well as tenants in common.

We also note section 61, which lists numerous transfers and transactions that *do* constitute a "change in ownership" begins with the caveat, "[e]xcept as otherwise provided in Section 62, change in ownership . . . includes, but is not limited to . . . ." (§ 61.) In addition, section 65, which pertains specifically to joint tenancies, commences by stating: "The creation, transfer, or termination of any joint tenancy is a change in ownership except as provided in this section, Section 62, and Section 63. . . . (§ 65, subd. (a).) Furthermore, neither the reference to section 62 in section 61, nor in section 65, is limited to any particular subdivision of section 62.

14

We agree the statutes, even as refined by way of amendment, are not stellar models of clarity. However, when the statutory scheme is read in its entirety, it is apparent family joint tenancies are not embraced within the change in the method of holding title exception set forth in section 62, subdivision (a)(1).

We look first at section 62, which lists numerous transfers and transactions that do *not* constitute a change in ownership. In addition to the change in the method of holding title exception set forth in subdivision (a)(1), the statute also specifically addresses joint tenancies in subdivision (f). Consistent with the view that creation of a family joint tenancy is akin to making a will and should be similarly treated, subdivision (f) specifies *no* change in ownership occurs upon "[t]he creation or transfer of a joint tenancy interest if the transferor, after the creation or transfer, is one of the joint tenants as provided in subdivision (b) of Section 65." (§ 62, subd. (f).) As we have discussed, section 65, subdivision (b), specifically governs family joint tenancies and defines the term "original transferor," a term essential to and pertaining exclusively to family joint tenancies. Thus, as to joint tenancies specifically, the only exception provided by section 62 from change in ownership is the creation of a family joint tenancy or transfer of such interest.

Section 61, which lists numerous transfers and transactions that *do* constitute a change in ownership (except "as otherwise provided in Section 62"), also specifically addresses joint tenancies. Subdivision (e) provides that "[t]he creation, transfer, or termination of any joint tenancy interest" *is* a change in ownership "except as provided in subdivision (f) of Section 62, and in Section 63 and 65." (§ 61, subd. (e).) Section 62, subdivision (f), and section 65, as we have discussed, pertain to family joint tenancies. (§§ 62, subd. (f), 65.) Section 63 excludes transfers between spouses. (§ 63.) Thus, as to joint tenancies specifically, section 61 provides the creation, transfer or termination of a joint tenancy *does* result in a change in ownership, except as to family joint tenancies as provided for in other statutes.

Section 61 also specifically addresses tenancies in common. Subdivision (f) specifies "[t]he creation, transfer, or termination of any tenancy-in-common interest" *is* a change in ownership "except as provided in subdivision (a) of Section 62, and in

15

Section 63." (§ 61, subd. (f).)  As noted, section 63 excludes transfers between spouses, and section 62, subdivision (a), of course, is the provision Mikkelsen contends applies to the termination of his joint tenancy.

A comparison of subdivisions (e) and (f) of section 61 demonstrates the Legislature intended that subdivision (a) of section 62 apply to tenancies in common, but not to family joint tenancies.  Subdivisions (e) and (f) of section 61 make highly specific references to other statutes—subdivision (e) of section 61, pertaining to joint tenancies, refers to subdivision (f) of section 62, whereas subdivision (f) of section 61, pertaining to tenancies in common, refers to subdivision (a) of section 62.  Had the Legislature intended that section 62, subdivision (a), apply to family joint tenancies, it would have referenced section 62, subdivision (a), in *both* subdivision (e) and (f) of section 61.  It did not, and referenced section 62, subdivision (a), only in connection with tenancies in common.  (§ 61, subd. (f).)  Moreover, it referenced a different subdivision of section 62, subdivision (f), in connection with joint tenancies.  (§ 61, subd. (e).)

Thus, while we agree the term "coowners" in section 62, subdivision (a)(1), is sufficiently broad to include family joint tenancies, the other statutes which comprise the statutory scheme defining change in ownership and of which it is a part, demonstrate the term does not include such joint tenancies.  Rather, the statutory provisions specifically applicable to family joint tenancies are section 61, subdivision (e), section 62, subdivision (f), and section 65, subdivisions (b) through (e).  (§§ 61, subd. (e), 62, subd. (f), 65, subds. (b)–(e).)

The legislatively commissioned reports giving rise to these statutes also reflect this view of the applicability of the change in method of holding title exception set forth in section 62, subdivision (a)(1).  The Task Force Report made little mention of tenancies in common or the change in method of holding title exception set forth in section 62, subdivision (a)(1).  Rather, it focused on the treatment of joint tenancies, and in particular family joint tenancies.  It made no suggestion section 62, subdivision (a)(1), applied to family joint tenancies.  (Task Force Report at pp. 41–42.)

16

The Implementation Report separately discussed joint tenancies and tenancies in common. (Implementation Report, pp. 20–23.) With respect to joint tenancies, the report identified "three major exceptions" to the general rule (set forth in section 61, subdivision (e), and section 65, subdivision (a)) that creation, transfer or termination of a joint tenancy interest *does* constitute a change in ownership, triggering a reappraisal of the interest. (Implementation Report at p. 20.) These three exceptions are: (1) the creation or transfer of a joint tenancy interest where the "original transferor" remains a one of the joint tenants; (2) the termination of an "original transferor's" interest as a result of death and the transfer is to a remaining "original transferor"; and (3) the termination of a non-original transferor's interest, if the transfer is back to the original transferor. (Implementation Report at pp. 21–22.) These are the *only* exceptions to the general rule identified for family joint tenancies—no mention is made of an additional exception under section 62, subdivision (a)(1). In contrast, with respect to tenancies in common, the Implementation Report expressly referenced the change in method of holding title exception set forth in section 62, subdivision (a)(1), explaining that where there is a change in the method of holding title, "such as a partition of a tenancy-in-common," the tenancy in common interest "is NOT reappraised." (Implementation Report at p. 23.)

As we have discussed, the Board of Equalization has also consistently taken the position change in ownership with respect to family joint tenancies is governed exclusively by the statutes specifically pertaining to such joint tenancies, namely, section 61, subdivision (e), section 62, subdivision (f), and section 65, subdivisions (b) through (e). (E.g., State Bd. of Equalization Letters to County Assessors No. 80/180 (Dec. 9, 1980), pp. 1–4 [discussing revisions to sections 62 and 65 made in 1980 by SB 1260 and AB 2777].)

We therefore conclude the change in the method of holding title exception set forth in section 62, subdivision (a)(1), does not apply to the termination of family joint tenancy at issue here.

### IV. DISPOSITION

The judgment is reversed. Parties are to bear their own costs on appeal.

17

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.

A134340, *Benson v. Marin Co. Assessment Appeals Bd.*

Trial Judge:                                   Honorable Faye D'Opal
Trial Court:                                    Marin County Superior Court


Jack F. Govi and Sheila Lichtblau for Plaintiff and Appellant.

Frank I. Mulberg and Brett D. Mulberg for Real Party in Interest.

Kamala D. Harris, Attorney General and Joyce E. Hee, Supervising Deputy Attorney General for the California State Board of Equalization as Amicus Curiae on behalf of Defendant.