# IN THE SUPREME COURT OF CALIFORNIA

JEFFREY PRANG, as County Assessor, etc.,
Plaintiff and Respondent,

v.

LOS ANGELES COUNTY ASSESSMENT APPEALS BOARD,
Defendant and Respondent;
LUIS A. AMEN et al., as Trustees, etc.,
Real Parties in Interest and Appellants.

S266590

Second Appellate District, Division Five
B298794

Los Angeles County Superior Court
BS173698

May 30, 2024

Justice Evans authored the opinion of the Court, in which
Chief Justice Guerrero and Justices Corrigan, Liu, Kruger,
Groban, and Jenkins concurred.

PRANG v. LOS ANGELES COUNTY ASSESSMENT
APPEALS BOARD

S266590


Opinion of the Court by Evans, J.


Article XIII A of the California Constitution, added by
Proposition 13, strictly limits increases in the assessed value of
real property unless the property undergoes a "change in
ownership." (Cal. Const., art. XIII A, § 2, subds. (a), (b);
see *Citizens for Fair REU Rates v. City of Redding* (2018) 6
Cal.5th 1, 10.)

A change in ownership generally occurs with a transfer of
real property. In a typical real estate transaction where one
party transfers real property to another, there is
unquestionably a change in ownership as title passes from the
transferor to the transferee. Whether there has been a
"change in ownership" in transactions involving a legal entity,
however, is a more complex issue that can give rise to certain
anomalies. If individual owners transfer real property to an
entity they own, for example, it can be argued that the transfer
has not caused a change in underlying "ownership," but merely
a change in the form of holding title. Likewise, when there is a
significant change in the ownership of a legal entity, it can be
argued that this causes a change in ownership of the entity's
real property despite no change in title.

In enacting a statutory scheme to implement Proposition
13, the Legislature sought to account for these anomalies. It
also chose to adopt different rules to govern these different

1

situations. Governing the transfer at issue here, Revenue and Taxation Code section 62, subdivision (a)(2)[1] identifies property transfers that, although they result in a change in title, nonetheless do not constitute a "change in ownership." The statute excludes from change in ownership any transaction involving a legal entity that "results solely in a change in the method of holding title to the real property and in which *proportional ownership interests* of the transferors and transferees, whether represented by *stock*, partnership interest, or otherwise, in each and every piece of real property transferred, remain the same after the transfer." (§ 62, subd. (a)(2), italics added.)

Here, a family corporation transferred ownership of a pair of supermarkets to one of its shareholders, a revocable trust. The trust held all the corporation's voting stock. The corporation also had a small number of individual shareholders who held nonvoting stock; those shareholders had no interest in the trust. The transfer of the properties to the trust thus eliminated whatever interests the individual shareholders held in the corporation's real property. The question presented is whether this transfer of the properties nonetheless is excluded from change in ownership under section 62, subdivision (a)(2); that is, whether the proportional ownership interests in the real property transferred, as "represented by stock, partnership interest, or otherwise," remained the same before and after the transfer.

The trustees, appellants here, argue that no change in ownership occurred because the trust held all the corporation's

---

[1] Unless indicated otherwise, subsequent statutory citations are to the Revenue and Taxation Code.

voting stock. According to the trustees, the term "stock" in section 62, subdivision (a)(2) must be interpreted to mean voting stock. In advancing this argument, the trustees point to another Revenue and Taxation Code section concerning transfers of *ownership interests in legal entities*, which expressly refers to "voting stock" (§ 64, subd. (c)(1)), and argue that sections 62 and 64 must be read together. Section 64 provides a transfer of ownership interests in a corporation will result in a change in ownership of its real property only when there is a change in corporate "control," which is determined by ownership of a majority of its "voting stock." (§ 64, subd. (c)(1).) The county assessor, respondent here, argues section 62, subdivision (a)(2) is unambiguous and measures *ownership interests in real property* transferred to or from a corporation by all stock. Under that measure, a change in ownership occurred.

The Court of Appeal agreed with the county assessor and held the transfer of the property from the corporation to the trust resulted in a change in ownership. The trustees challenge that holding on the ground that the Court of Appeal failed to accord proper deference to the implementing regulation and interpretative materials issued by the state Board of Equalization. We conclude the agency's implementing regulation and interpretative materials do not support the trustees' reading of section 62, subdivision (a)(2). To understand why that is the case, however, it is necessary to begin with the plain language of the statute and the usual statutory interpretation framework.

Applying this framework, we conclude that section 62, subdivision (a)(2) measures proportional beneficial ownership interests in corporate real property by corporate stock

generally.  Further, because sections 62 and 64 concern different ownership interests — ownership interests *in real property* and ownership interests *in legal entities*, respectively — section 64 does not compel a contrary reading of section 62.  The Board of Equalization's guidance either concerns section 64, and is therefore not pertinent, or fails to directly consider the issue presented here, and is therefore unpersuasive.  Accordingly, we affirm the Court of Appeal, which held in a manner consistent with these conclusions.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The real property at issue consists of two Los Angeles supermarkets operating under the brand name "Super A Foods" (the properties).  In December 2014, Super A Foods, Inc., a corporation (the corporation), transferred the properties to the Amen Family 1990 Revocable Trust (the trust).

At the time of the transfer, the corporation had two classes of stock, "Voting Common Stock" and "Non-Voting Common Stock."  Under its articles of incorporation, the sole difference between the rights possessed by holders of these respective classes of stock concerned control over corporate governance.  Control over corporate governance was granted exclusively to holders of the voting stock:  "Except with respect to all voting rights being vested exclusively in the holders of the Voting Common Shares, as herein above provided, the Voting Common Stock and the Non-Voting Common Stock shall be equal in all other respects including, but not limited to, dividend and liquidation rights."

The trust owned 92.8 percent of the corporation's stock, which included 100 percent of the voting stock.  The trust had two beneficiaries, Louis Amen and Dolores Amen.  Four

individuals — other members of the Amen family and a long-time employee of the corporation — owned approximately 5.2 percent of the corporation's stock, all nonvoting stock.

The Los Angeles County Assessor, respondent Jeffrey Prang (assessor), determined that the transfer of the properties from the corporation to the trust constituted a change in ownership and conducted a reassessment of the properties, doubling their assessed value from $5,140,120 to $10,280,000. The assessor looked at all corporate stock and determined that the proportional ownership interests in the properties were not the same before and after the transfer because the interests of the individual shareholders were eliminated.

The Los Angeles County Assessment Appeals Board (Appeals Board) reversed the decision of the assessor. The Appeals Board asserted, without supporting authority, that "the beneficial interest in [corporate] real property is ultimately held by the persons who control the corporation through its voting stock." Looking at the corporation's voting stock only, the Appeals Board determined that the proportional ownership interests in the properties were the same before and after the transfer because they remained with the trust. In reaching this conclusion, the Appeals Board also relied on guidance issued by the Board of Equalization (State Board), the agency responsible for promulgating property tax assessment regulations and guidance.

The assessor filed a petition for writ of mandate in the superior court. The superior court granted the petition and issued an order directing the Appeals Board to vacate its decision. The trustees appealed. In a published opinion, and

over a dissent, the Court of Appeal affirmed, rejecting the Appeals Board's interpretation of section 62 and agreeing with the assessor. (*Prang v. Los Angeles County Assessment Appeals Bd.* (2020) 58 Cal.App.5th 246, 261 (*Prang*).)

The Court of Appeal majority held that section 62, subdivision (a)(2) is unambiguous and measures proportionality by all corporate stock. (*Prang, supra*, 58 Cal.App.5th at p. 255, fn. 4; *id.* at pp. 254–261.) It rejected the argument that the provision is rendered ambiguous when read in light of the statute as a whole or in light of the overall legislative scheme, which hinged on the trustees' assertion that sections 62 and 64 must be read together. (*Id.* at p. 259.) The majority reasoned that the two sections address different kinds of transactions: section 62 concerns the transfer of interests in real property, whereas section 64 concerns the transfer of interests in a legal entity. (*Ibid.*) For this reason, "section 64's rules relating to control of a corporation do not fit in the proportionality exclusion under section [62, subdivision (a)(2)]." (*Ibid.*)

The dissent did not undertake its own statutory interpretation. (*Prang, supra*, 58 Cal.App.5th at pp. 261–263 (dis. opn. of Baker, J.).) Rather, the dissent found it persuasive that the State Board "interpreted the term 'stock' to mean voting stock" in "related statutes" (i.e., § 64) and in "guidance . . . that discusses . . . section 62, subdivision (a)(2)." (*Id.* at p. 262.) The dissent saw "no good reason to deviate from" the agency's interpretation. (*Ibid.*)

We granted review to resolve these issues of statutory interpretation and agency deference.

## II.  DISCUSSION

Whether transfer of the properties from the corporation to the trust constitutes a "change in ownership" is a question of statutory interpretation, a task governed by long-settled principles.  "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose."  (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)  "We first consider the words of the statutes, as statutory language is generally the most reliable indicator of legislation's intended purpose."  (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 227 (*McHugh*).)  "We consider the ordinary meaning of the relevant terms, related provisions, terms used in other parts of the statute, and the structure of the statutory scheme."  (*Ibid.*)  If the relevant statutory language permits more than one reasonable interpretation, we look to appropriate extrinsic sources, such as the statute's purpose, legislative history, and public policy.  (*Coalition of Concerned Communities, Inc.*, *supra*, at p. 737.)  We also extend some deference to the State Board's constructions of the Revenue and Taxation Code, "to the extent that [they] are embodied in quasi-legislative regulations or constitute long-standing, consistent, and contemporaneous interpretations."  (*McHugh*, *supra*, at p. 227, citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12–13 (*Yamaha*).)

### A. Proposition 13

Proposition 13, adopted in 1978, limits the ad valorem tax on real property to one percent of its "full cash value." (Cal. Const., art. XIII A, § 1, subd. (a); *Auerbach v. Assessment Appeals Bd. No. 1* (2006) 39 Cal.4th 153, 160 (*Auerbach*).)  The

full cash value may be adjusted for inflation but only at a
maximum rate of two percent per year.  (Cal. Const., art. XIII
A, § 2, subd. (b).)  "Full cash value" is defined as the county
assessor's valuation of the property on the 1975–1976 tax bill
"or, thereafter, the appraised value of real property when
purchased, newly constructed, or a change in ownership has
occurred after the 1975 assessment."  (Cal. Const., art. XIII A,
§ 2, subd. (a); *Auerbach*, *supra*, at p. 160.)  As stated above,
this case turns on whether a "change in ownership" occurred
when the properties were transferred from the corporation to
the trust.

  1. *Section 60*

  Because Proposition 13 did not define "change in
ownership," it fell to the Legislature to do so.  (*Pacific
Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th
155, 160–161 (*Pacific Southwest*).)  To accomplish this task,
the Assembly Committee on Revenue and Taxation created a
35-member task force to study this and other aspects of
Proposition 13 and to make recommendations "as to
appropriate law changes."  (Assembly Com. on Revenue &
Taxation, Rep. of the Task Force on Property Tax
Administration (Jan. 22, 1979) p. 1 (Task Force Report); see
*Pacific Southwest*, *supra*, at p. 161.)  The work of the task force
culminated in the Task Force Report.  (*Pacific Southwest*,
*supra*, at p. 161.)

  The task force "sought to distill the basic characteristics
of a 'change in ownership' and embody them in a single test
which could be applied evenhandedly to distinguish between
'changes' and 'non-changes', both those which the Task Force
could and those which it did not foresee."  (Task Force Report,

*supra*, at p. 38.)  The task force formulated a three-part test intended to be generally "consistent with the normal understanding of 'change in ownership.' " (*Ibid.*)  Adopted verbatim by the Legislature as Revenue and Taxation Code section 60, and unchanged since, it provides:  "A 'change in ownership' means a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." (*Id.* at p. 48; *Pacific Southwest*, *supra*, 1 Cal.4th at p. 161; see Stats. 1979, ch. 242, § 4.)

### 2.  *Section 62, subdivision (a)(2)*

To aid in the implementation of section 60, the task force proposed the adoption of "specific statutory examples" to elaborate on "common transactions."  (Task Force Report, *supra*, at p. 40.)  The task force stressed that the examples were designed to be "<u>consistent</u> with the general test," as the "entire statutory design would be destroyed" if specific transfers were treated in an inconsistent manner.  (*Id.* at p. 40; *id.* at p. 41.)  The task force was concerned that inconsistency might result in the invalidation of the statutory scheme based on "the lack of any consistent, rational interpretation of the constitutional phrase, 'change in ownership.' "  (*Id.* at pp. 40–41; *Pacific Southwest*, *supra*, 1 Cal.4th at pp. 161–162.)  The examples were embodied primarily in two statutes — section 61, setting forth types of common transfers that *do* result in a change in ownership, and section 62, setting forth types of transfers that *do not* result in a change in ownership.  (Task Force Report, *supra*, at pp. 49–51; *Auerbach, supra*, 39 Cal.4th at p. 161.)

Section 61 provides, in pertinent part, "[e]xcept as otherwise provided in Section 62, change in ownership, as defined in Section 60, includes, but is not limited to . . . [t]he transfer of any interest in real property between a corporation, partnership, or other legal entity and a shareholder, partner, or any other person." (§ 61, subd. (j).) The parties do not dispute that transfer of the properties from the corporation to the trust must be deemed a change in ownership under section 60 and section 61, subdivision (j) unless it qualifies for exclusion under section 62, subdivision (a)(2) (section 62(a)(2)).

Section 62(a)(2), which addresses transfers of real property involving legal entities, is intended to exclude transfers that constitute merely a change in the form of holding title. It provides that "change in ownership" does not include "[a]ny transfer between an individual or individuals and a legal entity or between legal entities, such as a cotenancy to a partnership, a partnership to a corporation, or a trust to a cotenancy, that results solely in a change in the method of holding title to the real property and in which *proportional ownership interests* of the transferors and transferees, whether represented by stock, partnership interest, or otherwise, in each and every piece of real property transferred, remain the same after the transfer." (§ 62(a)(2), italics added.) For example, if two individuals who own real property in equal shares transfer the property to a corporation they own in equal shares, such transfer is excluded from change of ownership.

### 3. *Section 64, subdivisions (c)(1) and (d)*

Section 64, which concerns the purchase or transfer of ownership interests in legal entities, is not directly implicated

by the facts of this case. The trustees do not argue otherwise. Instead, they contend section 64, namely subdivisions (c)(1) and (d), bear on the proper interpretation of the term "ownership interests" in section 62(a)(2). According to the trustees, statutory uniformity requires that "ownership interests" have the same meaning across these three subdivisions.

Section 64, subdivision (a) (section 64(a)) begins by declaring the general rule that a transfer of ownership interests in a legal entity does not cause a change in ownership of the entity's real property. Section 64, subdivision (c)(1) (section 64(c)(1)) provides an exception to this rule: "When a corporation, partnership, limited liability company, other legal entity, or any other person obtains control through direct or indirect ownership or control of more than 50 percent of the voting stock of any corporation, or obtains a majority ownership interest in any partnership, limited liability company, or other legal entity through the purchase or transfer of corporate stock, partnership, or limited liability company interest, or ownership interests in other legal entities, including any purchase or transfer of 50 percent or less of the ownership interest through which control or a majority ownership interest is obtained, the purchase or transfer of that stock or other interest shall be a change of ownership of the real property owned by the corporation, partnership, limited liability company, or other legal entity in which the controlling interest is obtained." As to a corporation, then, a change in ownership of its real property occurs when there is a change in "control" of the corporation, which is determined by ownership of a majority of its voting stock.

Section 64, subdivision (d) (section 64(d)) provides another exception to the general rule of subdivision (a), applicable only to real property that was previously transferred to an entity in a transaction covered by section 62(a)(2).  Following such a transfer, "the persons holding ownership interests in that [transferee] entity immediately after the transfer shall be considered the 'original coowners.' " (§ 64(d).)  "Whenever shares or other ownership interests representing cumulatively more than 50 percent of the total interests in the entity are transferred by any of the original coowners in one or more transactions, a change in ownership of that real property owned by the legal entity shall have occurred . . . ." (*Ibid.*)  In effect, after an entity has obtained real property in a transfer covered by section 62(a)(2), a change in ownership of that property occurs if the original coowners subsequently transfer more than 50 percent of the total interests in the entity, even if no one person or legal entity thereby obtains control of the transferee entity so as to trigger the exception set forth in section 64(c)(1).

## B. The Language of Section 62(a)(2)

As always, our inquiry begins with the language of the statute.  The parties agree that change in ownership here is governed by section 62(a)(2), which excludes "[a]ny transfer between an individual or individuals and a legal entity or between legal entities . . . that results solely in a change in the method of holding title to the real property and in which proportional ownership interests of the transferors and transferees, whether represented by stock, partnership interest, or otherwise, in each and every piece of real property transferred, remain the same after the transfer."  We conclude the language of section 62(a)(2) indicates that:  the statute

concerns ownership interests *in real property*; for legal entities, those ownership interests are the *beneficial ownership interests* that those who own the entity have in its real property; and for a corporation, those beneficial ownership interests are measured by *corporate stock generally*.

> 1. *"Proportional ownership interests" in section 62(a)(2) refers to interests in real property*

A principal requirement of the exclusion set forth in section 62(a)(2) is that the proportional "ownership interests" remain the same before and after transfer of the real property. The Court of Appeal majority agreed with the assessor that the ownership interests to which section 62(a)(2) refers are interests in the real property transferred, whereas the ownership interests at issue in section 64 are interests in a legal entity. The trustees dispute that "[s]ections 62 and 64 measure different kinds of ownership," arguing that "both statutes measure 'ownership interests' in legal entities." Based on this understanding, the trustees assert that ownership interests in a corporation must be measured by voting stock only, because corporate ownership is measured by voting stock for purposes of section 64, subdivisions (c)(1) and (d).

The assessor is correct that the statute must be interpreted to refer to proportional ownership interests in the transferred real property, rather than in any entities involved in the transfer. This is the construction dictated by the express language of section 62(a)(2), which requires that the "proportional ownership interests . . . *in each and every piece of real property transferred*" remain the same. (Italics added.) This interpretation also is necessary for the full application of

the statute. Section 62(a)(2) applies to transfers involving both entities and individuals. If "proportional ownership interests" referred to interests in an entity, it could not be applied to a transfer involving individuals; there would be no entity in which their ownership interests could be measured.

2. *With regard to a legal entity, "proportional ownership interests" refers to beneficial ownership interests*

Though it is clear that section 62(a)(2) refers to ownership interests in real property, there is a further analytical inquiry we must engage with: how are those ownership interests represented. For an individual, ownership interests are represented by the individuals' direct ownership interests in the real property. As explained below, that cannot be the case when the transferor or transferee of the property is an entity. With respect to entities, we conclude "proportional ownership interests" must be understood to refer, not to direct ownership interests, but to the beneficial ownership interests that the persons who own the entity hold in the property. (See § 60 [defining "change in ownership" as "a transfer of a present interest in real property, including the beneficial use thereof"].) Two features of section 62(a)(2) compel this understanding.

First, the statute refers to the proportional ownership interests "of the transferors and transferees" in the transferred property. When real property is transferred by or to an entity, the entity conveys or obtains 100 percent of the direct ownership interests in the property. For that reason, any transfer of real property involving an entity necessarily results in a change in the proportional direct ownership interests of

the transferors and transferees.  In this case, for example, 100 percent of the direct ownership interests in the properties transferred from the corporation to the trust.  Yet the statute plainly contemplates that such transfers fall within the ambit of section 62(a)(2).  It follows then, that with respect to entities, we must look, not to the transfer of direct ownership interests, but to the transfer of beneficial ownership interests to assess proportionality.  Although a corporation has full direct ownership of its property, its shareholders will have partial, proportional beneficial ownership interests therein.

Second, this reading of the statute squares the mandate that "proportional ownership interests . . . in each and every piece of real property transferred" must remain the same with the assertion that those interests may be "represented by stock, partnership interest, or otherwise."  (§ 62(a)(2).)  Stock and partnership interests represent ownership interests in entities.  Possession of an ownership interest in an entity owning real property does not afford a direct ownership interest in the entity's property.  Thus, it is apparent that, when the transferor or transferee is an entity, "proportional ownership interests" refers to beneficial ownership interests in the real property as represented by indicia of ownership in the entity.

This interpretation is consistent with the first mandate of section 62(a)(2) — that a transfer "results *solely* in a change in the method of holding title to the real property."  (Italics added.)  A transfer results "solely" in a change in the method of holding title if ownership of the property does not change beyond a change in the identity of the titleholder(s).  That condition is satisfied, when two entities are involved, if the proportional beneficial ownership interests of the owners of the

entities remain the same, or, when individuals and an entity are involved, the proportional direct ownership interests of the individuals are identical to their proportional beneficial ownership interests as owners of the entity. In such circumstances, the identity of the titleholder(s) of the real property will change, but the underlying "ownership" of the property will not. In contrast, if the beneficial owners change, or the proportionality of their ownership interests change, the transfer will result in something more than a change in the method of holding title; it will result in a change in the property's underlying "ownership." The proportionality requirement gives substance to the first mandate of the statute.

3. *By the statute's terms, as well as general corporate legal principles, beneficial ownership interests in corporate property are measured by corporate "stock" generally*

Although we reject the trustees' threshold assertion regarding the "ownership interests" to which section 62(a)(2) refers, that does not fully dispose of their argument. As section 62(a)(2) recognizes in stating that proportional ownership interests are "represented by stock, partnership interest, or otherwise," the beneficial ownership interests of the owners of a transferor or transferee entity in that entity's real property are measured by, and are therefore identical to, their proportional ownership interests in the entity. That is, a 50 percent shareholder of a corporation owns a 50 percent beneficial ownership interest in the real property of the corporation. The trustees argue that ownership interests in a corporation should be measured by *voting* stock only, rather than all stock. We reject this argument as inconsistent with

16

both the language of the statute and general corporate legal principles.

Taken strictly as a matter of statutory construction, the argument falters because it seeks to " 'insert what has been omitted' " from the statute. (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998, quoting Code Civ. Proc., § 1858.) " 'Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' " (*In re Jennings* (2004) 34 Cal.4th 254, 265.) Section 62(a)(2) refers to "ownership interests . . . represented by *stock*, partnership interest, or otherwise." (Italics added.) The trustees point to nothing in the language of section 62(a)(2) or its legislative history that suggests the Legislature intended the term "stock" to refer only to *voting stock*.

The trustees nonetheless seek to impose this limitation by reference to section 64, which expressly refers to "voting stock." (§ 64(c)(1).) Yet, "[a]s a general rule, when the Legislature uses a term in one provision of a statute but omits it from another . . . we generally presume that the Legislature did so deliberately, in order ' "to convey a different meaning." ' " (*Scher v. Burke* (2017) 3 Cal.5th 136, 144–145 (*Scher*), quoting *Klein v. United States of America* (2010) 50 Cal.4th 68, 80; *In re Ethan C.* (2012) 54 Cal.4th 610, 638 ["When language is included in one portion of a statute, its omission from a different portion addressing a similar subject suggests that the omission was purposeful."].) If the Legislature intended to limit section 62(a)(2)'s reference to "stock" to the single class of voting stock, it could have said so expressly, as it did in similar Revenue and Taxation Code provisions, such as section 64(c)(1). Instead, the Legislature

used the general term "stock," suggesting it intended to refer more broadly to other classes of stock.[2]  Specifically, in this context, "stock" is most naturally understood to refer to all stock that carries a beneficial interest in the property of a corporation.

We observe that this construction of section 62(a)(2) is consistent with general corporate legal principles.  Shares of stock are "the units into which the proprietary interests in a corporation are divided in the articles."  (Corp. Code, § 184.)  A corporation "may issue one or more classes or series of shares or both, with full, limited or no voting rights and with such other rights, preferences, privileges and restrictions as are stated or authorized in its articles."  (Corp. Code, § 400, subd. (a).)  "Voting stock" refers to a class of stock that has voting rights, which means, generally, "the power to vote for the election of directors."  (Corp. Code, § 194.5.)  The authority to manage the business and affairs of a corporation is vested in its board of directors.  (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108.)  Holders of voting stock exercise indirect control over corporate affairs, however, through their voting power.  (See Corp. Code, § 160, subd. (a).)

The legal relationship between the shareholders of a corporation and the corporation's property was summarized

---

[2]     As the Court of Appeal majority noted, there are many classes of stock:  "The [Revenue and Taxation] code expressly identifies numerous subcategories of stock: voting stock (§ 64), nonvoting stock (§ 23361), capital stock (§ 212), treasury stock (§ 24942), common stock (§ 23040.1), preferred stock (§ 23040.1), and qualified small business stock (§ 18038.4)."  (*Prang, supra,* 58 Cal.App.5th at p. 259.)  The statutory references to these various classes of stock reaffirms our reading of "stock" in section 62(a)(2) as a general term.

over a century ago in *MacDermot v. Hayes* (1917) 175 Cal. 95
(*MacDermot*): "A corporation is created and given a legal
existence in order that it may, in its legal capacity, hold and
manage the property transferred and business committed to it
by its stockholders. They are the beneficial owners of the
corporate property. The corporation is their agency and holds
the property for their benefit and in trust for them. The
interest of each stockholder in the property is the proportion
which his shares of stock bear to all the stock outstanding.
The [share] certificates are not property in the real sense, but
are merely evidences of the undivided interests of the several
stockholders in the corporate assets and business." (*Id.* at
p. 114.) Although shareholders do not hold legal title to the
corporation's property, they are said to have "an equitable
interest therein" as beneficial owners. (*Newell-Murdoch Realty
Co. v. Wickham* (1920) 183 Cal. 39, 45 ["A stockholder in a
corporation has a beneficial interest, in proportion to the
amount of his stock, in all the property of the corporation"].)

As the foregoing makes clear, beneficial ownership of
corporate real property lies with shareholders generally;
ownership of a share of a corporation's voting stock ordinarily
confers no greater beneficial ownership interest in the property
of the corporation than ownership of a share of nonvoting
stock. That was certainly true in this case.[3] Under the
corporation's articles of incorporation, the only difference
between voting and nonvoting stock was the right of the former
to exercise voting power. The voting and nonvoting stock were

---

[3] The present case does not implicate, and we leave for
another day, questions regarding the proper application of
section 62(a)(2) if a corporation were to issue shares with
limited or subordinated interests in the corporate property.

"equal in all other respects including, but not limited to, dividend and liquidation rights." Voting and nonvoting stock thus enjoyed identical economic rights in the corporation and its property. If the corporation's assets were liquidated, for example, "[i]t is not inconceivable" that each individual shareholder "would be entitled to between $92,520 and $174,760" based on their proportional shareholdings and the appraised value of the property. (*Prang*, *supra*, 58 Cal.App.5th at p. 261, fn. 13.) For purposes of section 62(a)(2), then, all of the corporation's stock must be considered. The trustees' contrary argument conflates corporate ownership with corporate control. Because section 62(a)(2) makes no reference to corporate control, the construction proposed by the trustees is inapt.

### C. The Language of Section 64

The trustees' fundamental argument for construing the term "stock" in section 62(a)(2) to mean "voting stock" is that this interpretation is necessary to maintain a uniform definition of "ownership interests" in section 62(a)(2) and other statutory provisions, namely section 64, subdivisions (c)(1) and (d). We reject this argument because our interpretation of section 62(a)(2) creates no statutory conflict with section 64.

As stated above, the term "stock" in section 62(a)(2) is used as a means for measuring the proportional beneficial ownership interests of corporate shareholders in *real property* transferred by or to a corporation. Section 64, on the other hand, concerns the purchase or transfer of ownership interests *in a legal entity*. Section 64(a) provides the general rule that "the purchase or transfer of ownership interests in legal entities, such as corporate stock or partnership or limited

liability company interests, shall not be deemed to constitute a transfer of the real property of the legal entity." Notably, section 64(a) refers to "stock" generally, not just voting stock; the general rule thus applies to both voting and nonvoting stock, and neither the trustees nor the State Board have suggested otherwise.

Section 64(c)(1) provides an exception to the general rule of section 64(a). As set forth above, the exception provides that, although the transfer of ownership interests in a legal entity generally does not constitute a change in ownership, there is a change in ownership when an individual or other legal entity obtains a "majority ownership interest" or "controlling interest" in the entity in question; for a corporation, control is obtained through ownership of "more than 50 percent of the voting stock." (§ 64(c)(1).) To the extent section 64(c)(1) refers to "ownership interests," they are interests in "any partnership, limited liability company, or other *legal entity*," not in transferred *real property*. (Italics added.) Further, although the subdivision refers to "voting stock," it is used as a measure of *corporate control*, not of *beneficial ownership interests in corporate real property*.

Section 64(d) is similar. It applies to property previously transferred to a legal entity in a transaction covered by section 62(a)(2). Following such a transaction, "the persons holding ownership interests in that legal entity immediately after the transfer shall be considered the 'original coowners.' " (§ 64(d).) A change in ownership of the real property previously transferred from the original coowners to the entity occurs if the original coowners subsequently transfer "shares or other ownership interests representing cumulatively more than 50 percent of the total interests in the entity." (*Ibid.*) Like

section 64(c)(1), section 64(d) makes no reference to proportional ownership interests in real property. Rather, it refers to "ownership interests . . . in the entity." (§ 64(d).) Section 64(d) does not itself refer to "stock" or "voting stock."[4]

In sum, because section 64, subdivisions (c)(1) and (d) contain no reference to ownership interests in real property, they cannot create a definitional conflict with section 62(a)(2). Further, even insofar as section 62(a)(2) looks to ownership interests in an entity, such as "stock," it does so as an indicium of beneficial ownership interests in the entity's real property. The sole reference to "voting stock" in the cited subdivisions of section 64 indicates it is used as a measure of corporate control, not of the shareholders' beneficial ownership interests in corporate real property. Given that sections 62 and 64 reach

---

[4]     Section 64(d) refers to "ownership interests representing cumulatively more than 50 percent of the total interests in the entity." Because the relevant ownership interests are not otherwise specified, section 64(d) may be ambiguous. The trustees read section 64(d) as referring to the same majority or controlling ownership interests expressly identified in section 64(c)(1). The relevant State Board regulation supports that interpretation. (Cal. Code Regs., tit. 18, § 462.180, subd. (d)(2) [specifying the relevant ownership interests are those "defined in subdivision (d)(1)," which mirrors the language of section 64(c)(1)].) For a corporation, then, the relevant ownership interests would be voting stock. We need not definitively construe section 64(d), however, to conclude it creates no conflict with our interpretation of section 62(a)(2). Even if a majority or controlling ownership interest in a corporation is measured by voting stock for purposes of section 64(d), that in no way undermines the conclusion that ownership interests in corporate real property are measured by stock generally for purposes of section 62(a)(2).

fundamentally different issues, the trustees' call for statutory uniformity is without basis.

The foregoing analysis points to a further infirmity in the trustees' reasoning. They assert that, " '[i]f Section 62(a)(2) means "all stock," the exclusion under Section 62(a)(2) would be measured under one standard — all stock — but under a different standard — voting stock — to measure when the exclusion ends under Section 64(d).' " Tellingly, the trustees do not explain why application of these two measures would be problematic. To be sure, if sections 62 and 64 used different measures for an identical or indistinguishable purpose, that might be problematic; but they do not. Contrary to the trustees' assertion, section 64(d) is not properly characterized as governing when the exclusion set forth in section 62(a)(2) "ends." Section 62(a)(2) applies, if at all, when real property is transferred to a corporation. Once the real property is held by a corporation, it enjoys the benefit of the general rule set forth in section 64(a) — that is, ownership interests in the entity generally can be freely transferred without triggering a change in ownership. Section 64, subdivisions (c)(1) and (d) set forth exceptions *to the general rule of section 64(a)*. Thus, section 64(d) is more aptly characterized as governing where the benefit of section 64(a) ends, albeit only as to property transferred to the corporation by the original coowners and not all property held by the corporation.

## D. The Legislative History and Public Policy

"Where statutory text 'is unambiguous and provides a clear answer, we need go no further.' " (*Scher*, *supra*, 3 Cal.5th at p. 148.) Even if we were to assume that the statutory text is ambiguous, however, extrinsic sources — including the

statute's purpose, its legislative history, and public policy —
are consistent with our reading of section 62(a)(2).

1. *The legislative history is consistent with our
construction of section 62(a)(2)*

As discussed above, section 62 emerged from the work of
a legislative task force assigned to propose implementing
legislation for Proposition 13, including the definition of
"change in ownership."  One issue the task force "considered at
length" was how to deal with real property owned by legal
entities.  (Task Force Report, *supra*, at p. 45.)  It considered
two alternative approaches:  the "separate entity" theory,
which respects an entity's "identity separate from its owners,"
and the "ultimate control" theory, which "[l]ooks through the
legal entity" to changes in majority control.  (*Ibid*.)  The task
force adopted the separate entity theory and recommended
that it "be followed consistently and without special
exclusions," though it recognized that this resulted in some
anomalous outcomes.  (*Id*. at p. 46.)  "For example," the Task
Force Report observed, "incorporation of a sole proprietorship
would be, an ownership change under the separate entity
theory.  On the other hand, under the separate entity theory,
the property of many corporations will never be fully
reappraised, since no 'change in ownership' will ever occur."
(*Ibid*.)

In keeping with the task force's commitment to
consistent application of the separate entity theory, its
legislative proposals contained no analog of section 62(a)(2),
which excludes transfers of real property to or from an entity
that result solely in a change in the method of holding title.

(See Task Force Report, *supra*, at p. 51.)[5]  In the absence of such a provision, a transfer between entities or between individuals and an entity was necessarily regarded as a change in ownership because the identity of the titleholder changed, even if the underlying beneficial ownership of the property did not.  As noted, the task force cited as an example the incorporation of a sole proprietorship as perhaps the most straightforward example of a change only in the form of ownership.  (*Id.* at p. 46.)

Although the task force's approach had the virtue of consistency, the failure to exclude transactions that result merely in a change in the method of holding title proved unacceptable.  Within a year after the Legislature adopted the task force's recommended version of section 62, it enacted the first version of the language now found in subdivision (a)(2), excluding such transfers.  (Stats. 1980, ch. 1081, § 2.3.)  As a contemporary bill analysis explained, the new provision "would allow a transfer of title into a distinct entity to be excluded from change in ownership, if . . . the proportionate share of ownership is not altered."  (Department of Finance, Analysis of Sen. Bill No. 1260 (1980–1981 Reg. Sess.) as amended Aug. 26, 1980, p. 2.)

---

[5]  The Legislature originally enacted Section 62 essentially as proposed by the task force.  Recommended subdivision (a) excluded "[a]ny transfer between coowners which results in a change in the method of holding title to the real property without changing the proportional interests of the coowners, such as a partition of a tenancy in common."  (Stats. 1979, ch. 242, § 4.)  It did not mention transfers involving legal entities.

The language of the 1980 amendment did not specify which ownership interests must remain unchanged. Rather, the provision excluded from a change in ownership any transfer involving an entity that results solely in a change in the method of holding title and "in which the proportional interests of the transferors and transferees, whether represented by stock, partnership interest, or otherwise, remain the same after the transfer." (Stats. 1980, ch. 1081, § 2.3.) This oversight was remedied two years later, when section 62(a)(2) was again amended and the language was changed to its present form, excluding transfers in which "proportional ownership interests of the transferors and transferees . . . *in each and every piece of real property transferred,* remain the same after the transfer." (Stats. 1982, ch. 1465, § 4.5, italics added.)

The legislation proposing the 1982 amendment, sponsored by the State Board, explained, "[t]he proposal would . . . make technical changes to Section 62(a)(2) for the purpose of clarifying that the 'proportional interests' must remain the <u>same</u> in each and every piece of real property transferred." (State Bd., Analysis of Assem. Bill No. 3382 (1982–1983 Reg. Sess.) as amended Aug. 10, 1982, p. 4; see also *id.* at p. 1.) To illustrate, the bill analysis provided the following example: "Corporation A owns Blackacre and Whiteacre, each of equal value. X and Y are each 50% of [sic] shareholders. Upon dissolution of Corporation A, X and Y receive a 1/2 undivided interest in both Blackacre and Whiteacre. This transfer is excluded under proposed Section 62(a)(2), whereas a transfer of Blackacre to X and Whiteacre to Y upon dissolution of Corporation A would not be, since the proportional ownership interests in each property is [sic] not the same before and after

the transfer." (*Id*. at p. 4.) The example is fully consistent with our interpretation of section 62(a)(2) because it compares the beneficial ownership interests of the shareholders in the property prior to the transfer with their direct ownership interests afterwards. The example makes no reference to voting shares.

Section 62(a)(2) was therefore expressly amended by the Legislature, at the behest of the State Board, to make clear that the phrase "proportional ownership interests" refers to interests in real property. To interpret the phrase to refer directly to interests in an entity, as the trustees urge, would contradict the Legislature's clearly expressed intent. Further, in proposing the amendment, the State Board used an example that makes no reference to voting shares, instead using ownership of corporate stock generally to represent proportional beneficial ownership interests. As stated above, a beneficial ownership interest in corporate real property is not dependent on ownership of shares having voting rights. To accept the trustees' contrary argument would expand the scope of the exclusion provided by section 62(a)(2) beyond that intended by the Legislature — i.e., to identify transfers of real property that result *solely* in the method of holding title.

An example is illustrative. In the instant case, the nonvoting stock represented a relatively small portion of the outstanding stock. Imagine, however, a corporation with two shareholders, one owning voting shares representing 50 percent of the outstanding corporate stock, and another owning nonvoting shares representing the remaining 50 percent. If the corporation's real property were transferred to the holder of the voting stock, the proportional ownership interests would remain unchanged when measured by voting

stock.  Yet the beneficial ownership interests in the real property would have changed dramatically.  The interest of the holder of voting stock would increase from 50 to 100 percent, while the interest of the other shareholder would decrease from 50 percent to nothing.  The number of persons holding a beneficial ownership interest likewise would be reduced by half.  To exclude this transaction from "change in ownership" would be in considerable tension with the requirement of section 62(a)(2) that the transfer result solely in a change in the method of holding title.

> ### 2. *There is no policy basis for requiring a uniform measure of "ownership interests" across these provisions*

We also find no policy basis to require a uniform measure of "ownership interests" across these statutory provisions.  To reiterate, section 62(a)(2) and section 64, subdivisions (c)(1) and (d) are intended to remedy anomalies created by the "separate entity" theory but are otherwise dissimilar.  Section 62(a)(2) describes transfers of real property by or to an entity that do not result in a change in ownership despite a formal change in the titleholder(s).  Section 64, subdivisions (c)(1) and (d) concern, in effect, the inverse of that situation.  Section 64 concerns the transfer of ownership interests in an entity.  Such transfers generally do not result in a change in ownership of the real property owned by the entity because they do not result in a change in the titleholder(s).  However, section 64, subdivisions (c)(1) and (d) describe the circumstances in which the transfer of interests in an entity will result in a change in ownership of the entity's real property despite no formal change in the titleholder(s).  The

Legislature's adoption of different rules to govern these different situations is entirely reasonable.

As to section 62(a)(2), adoption of a rule governed by control over an entity, rather than by beneficial ownership interests in the entity's real property, would be contrary to the express purpose of the proportional ownership interest exception:  the persons having a beneficial ownership interest in real property could be substantially changed without triggering a change in ownership.  So long as the persons holding the voting stock remained the same, no change in ownership would occur.  Recall the example above involving a corporation with two shareholders, one owning voting shares representing 50 percent of the outstanding corporate stock, and another owning nonvoting shares representing the remaining 50 percent.  If section 62(a)(2) were governed by corporate control, the real property owned by the corporation — in which both shareholders have identical dividend and liquidation rights — could be transferred to the voting shareholder without triggering a change in ownership, even though doing so would eliminate the beneficial ownership interests of the nonvoting shareholder.  The Legislature's decision to measure a change in ownership by proportional beneficial ownership interests, rather than control, thus limits application of the exception to transactions in which there is a change *solely* in the method of holding title.

Conversely, a change in corporate control is a rational measure for determining when an entity's real property is deemed to be subject to a change in ownership, despite no legal change in the titleholder.  In the absence of some such rule, the property of a corporation would never experience a change in ownership, even if the corporation itself changed hands

entirely. Yet a rule similar to that of section 62(a)(2), in which a change in ownership occurs whenever beneficial ownership changes, would put ownership of a public corporation's real property in perpetual flux and seriously hamper changes in ownership of corporations. A middle ground was necessary. The Legislature's decision to equate a change in control of the corporation to a change in ownership of its real property represents a reasonable compromise.

Borrowing an argument advanced by the State Board below, the trustees argue our construction "creates loopholes that allow for tax evasion." In the example they posit, if stock in section 62(a)(2) means "all stock," a corporation can issue a new class of nonvoting stock and then dissolve, such that the entity's former real property would then be partially owned by the new nonvoting shareholder.

As an initial matter, the trustees' example acknowledges that, upon dissolution, the corporation's real property would be proportionally divided among *all* shareholders, not just voting shareholders. Setting that aside, we acknowledge that neither our construction of the statute nor the one proposed by the trustees is likely to prevent all tax avoidance. The trustees do not, however, establish that our construction would " 'frustrate the manifest purpose of the legislation as a whole or otherwise lead to absurd results.' " (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 362, fn. 17.) The so-called "absurdity exception" requires " 'much more than showing that troubling consequences may potentially result if the statute's plain meaning were followed or that a different approach would have been wiser or better.' " (*Id.* at p. 356.) We are not persuaded to a different view of the statutory text based on the mere potential for loopholes. Of course, if the

Legislature becomes concerned that any loophole is being used to the detriment of the statutory scheme, it can step in to amend the statute.

Adopting another argument advanced by the State Board — and endorsed by the dissent — below, the trustees argue that reading "stock" in section 62(a)(2) to mean voting stock "avoids significant administrative difficulties." (*Prang, supra*, 58 Cal.App.5th at p. 262 (dis. opn. of Baker, J.).) According to the State Board, evaluating the proportional ownership interests of voting stock is relatively straightforward whereas evaluating the proportional ownership interests of all stock would " 'necessitate an evaluation of all the different classes and types of stock and their attendant rights, having to assign what may amount to random percentages of ownership to particular classes of stock since . . . owners of corporations have no specific right to any corporate real property.' " (*Ibid.*)

The trustees' assertion regarding the practicalities of assessing proportional ownership interests does not withstand scrutiny. As noted above, corporations "may issue one or more classes or series of shares or both, *with full, limited or no voting rights . . . .*" (Corp. Code, § 400, subd. (a), italics added.) Thus, evaluating the proportional ownership interests of different classes or series of voting stock, some with full voting rights and others with limited voting rights, is not necessarily straightforward. Moreover, the notion that evaluating the proportional ownership interests of all corporate stock is unworkable seems to be based on a faulty premise, i.e., that owners of corporations have "no specific right to any corporate real property." (*Prang, supra*, 58 Cal.App.5th at p. 262 (dis. opn. of Baker, J.).) Although shareholders have no *direct*

ownership interest in corporate real property, each shareholder enjoys a *beneficial* ownership interest in the property of the corporation equal to "the proportion which his shares of stock bear to all the stock outstanding." (*MacDermot*, *supra*, 175 Cal. at p. 114.) This principle is not particularly complex to apply; indeed, it is applied rather simply here.

Lastly, the trustees argue the construction of section 62(a)(2) we adopt today undermines uniformity in the administration of property tax assessment practices throughout the state — a goal the State Board is charged to promote through its rulemaking authority. (See Gov. Code, § 15606, subds. (c), (e), (f).) The trustees echo the view of the Court of Appeal dissent that our construction "permits the Los Angeles County Assessor to disregard the [State] Board's instructions and expertise, thereby opening the door to a patchwork, county-by-county system of differing reassessment methods that is the opposite of what the Legislature intended." (*Prang*, *supra*, 58 Cal.App.5th at p. 262 (dis. opn. of Baker, J.).)

We do not question that uniform application of property tax assessment practices throughout the state is an important policy goal. There is no evidence that our construction of section 62(a)(2) imperils that goal, however. Although the trustees suggest that the Los Angeles County Assessor is an outlier in its application of section 62(a)(2), we note that the California State Association of Counties and the California Assessors Association, which purport to represent all 58 counties, have filed an amicus curiae brief in support of the assessor here. They note that "there is no information in the record or known to amici to suggest that the Assessor is an outlier in his interpretation of the statute or that other counties are applying the law differently." The State Board,

which elected not to file an amicus curiae brief before this court, provided no evidence to the contrary below.  Moreover, as discussed in the section that follows, we conclude the State Board has not promulgated any controlling guidance that supports the trustees' construction of section 62(a)(2).

### E. The Agency Guidance

With the foregoing in mind, we turn to the trustees' argument that the Court of Appeal majority failed to accord proper deference to the State Board's implementing regulation and interpretative materials.  As set forth above, we may extend deference to the State Board's constructions of the relevant Revenue and Taxation Code provisions "to the extent that [they] are embodied in quasi-legislative regulations or constitute long-standing, consistent, and contemporaneous interpretations." (*McHugh*, *supra,* 12 Cal.5th at p. 227, citing *Yamaha*, *supra*, 19 Cal.4th at pp. 12–13.)

Although "the proper interpretation of a statute is ultimately the court's responsibility" (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 462), an agency's interpretation is one of several tools available to the court.  (*Yamaha*, *supra*, 19 Cal.4th at p. 7.)  Administrative rulemaking falls into two categories:  quasi-legislative rules, whereby an agency creates new substantive standards under an express delegation of legislative authority, and interpretative rulemaking, whereby an agency clarifies existing substantive standards set forth in some law or regulation that it is called upon to administer.  (*Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 556, citing *Yamaha*, *supra*, 19 Cal.4th at pp. 7–12.)  Quasi-legislative rules, such as the regulations implementing the

Revenue and Taxation Code, are afforded the "dignity of statutes." (*Yamaha, supra*, 19 Cal.4th at p. 10.) Interpretative rules, such as the other State Board materials cited by the trustees, are entitled to consideration and respect but are not binding or necessarily even authoritative. (*Id.* at pp. 7–8.) "[Their] power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Id.* at p. 7.) "Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Id.* at p. 8.)

Here, the trustees assert that the State Board has consistently construed "stock" in section 62(a)(2) to mean "voting stock," and that the Court of Appeal should have deferred to the agency's construction. In advancing this argument, they rely on the State Board's regulation implementing section 62(a)(2), which is published at California Code of Regulations, title 18, section 462.180 (Rule 462.180). They also rely on subsequent State Board publications purporting to interpret Rule 462.180. We conclude Rule 462.180 supports our interpretation of section 62(a)(2) and the remaining materials are unpersuasive.

1. *Rule 462.180 is consistent with our interpretation of section 62(a)(2)*

Rule 462.180 addresses "Change in Ownership — Legal Entities," a topic the regulation divides into two subtopics, "Transfers of Real Property to and by Legal Entities" (Rule 462.180, subd. (a)) and "Transfers of ownership interests in legal entities" (Rule 462.180, subd. (c)). Rule 462.180, subdivision (a) states the general rule, that "[t]he transfer of any interest in real property to a corporation, partnership,

34

limited liability company, or other legal entity is a change in ownership of the real property interest transferred." This is a straightforward application of the separate entity theory. The general rule is followed, in subdivision (b), with two exceptions. The first is not relevant here. The second, "Proportional Transfers of Real Property," reflects the exception contained in section 62(a)(2), stated in essentially the language of the statute. (Rule 462.180, subd. (b)(2).) It requires that "the proportional ownership interests in each and every piece of real property transferred remain the same after the transfer." (*Ibid.*) In this way, the rule provides no support for the trustees' argument.

Neither Rule 462.180, subdivision (b)(2), which reflects the language of section 62(a)(2), nor the explanatory examples that follow, mention voting stock. On the contrary, the examples are fully consistent with our understanding of the proper application of section 62(a)(2). Of particular interest is Example 2, which states: "A transfer of real property from A and B, as equal co-tenants, to Corporation X where A and B each take back 50 percent of the stock. No change in ownership. However, if A and B each take back 49 percent of the stock and C receives 2 percent of the stock then there will be a change in ownership of the entire property." (Rule 462.180, subd. (b)(2).) Two aspects of this example are notable. First, the "proportional ownership interests" referred to in the regulation are measured by the shareholders' beneficial ownership interests in the property, as measured by their shareholdings. Second, the example does not mention voting stock; the beneficial ownership interests are measured by stock generally. When the proportional beneficial ownership interests of the shareholders are the same as the proportional

direct ownership interests of the individual owners, as in the first part of the example, the exception applies; when they are not, as in the second part of the example, the exception does not apply. Example 5 is also of note. It provides: "A transfer of real property from Corporation X to its sole shareholder A. No change in ownership, even if A is an 'original co-owner,' because interests in real property, and not ownership interests in a legal entity, are being transferred." (*Ibid.*) This tends to defeat the trustees' argument that the distinction drawn by the Court of Appeal majority "between Section 62(a)(2) and Section 64 does not exist."

The trustees point to a different subdivision of Rule 462.180. Subdivision (c) of the rule concerns the transfer of ownership interests in legal entities, and it reiterates the general rule that the transfer of interests in a legal entity does not constitute a change in ownership of the real property owned by the entity. Subdivision (d) then provides exceptions to the general rule, with subdivision (d)(1), labeled "control," describing the exception set forth in section 64(c)(1). Like section 64(c)(1), Rule 462.180, subdivision (d)(1)(A) describes the measure of corporate control as "more than 50 percent of the voting stock." Subdivision (d)(2) of the rule describes the exception set forth in section 64(d). Rule 462.180, subdivision (d)(2) explains that the exception applies when original coowners subsequently transfer "more than 50 percent of the total control or ownership interests, *as defined in subdivision (d)(1) of this rule*, in that partnership, corporation, limited liability company or legal entity[.]" (Italics added.) The trustees point to this italicized language to argue that Rule 462.180 measures ownership interests in a corporation as voting stock for all purposes.

As discussed above, however, subdivisions (c) and (d) of Rule 462.180 concern "[t]ransfers of ownership interests in legal entities." No portion of the rule suggests the definition in subdivision (d)(1) has any applicability to subdivisions (a) and (b), which concern "transfers of real property to and by legal entities." (Capitalization omitted.) Thus, although the State Board's regulation may be entitled to the dignity of statute, nothing in Rule 462.180 can be read to suggest that "stock" in section 62(a)(2) means voting stock. In short, Rule 462.180 does not support the trustees' interpretation of section 62(a)(2). In the absence of any agency regulation to support their contrary interpretation, we have no cause to deviate from the plain meaning of the statute.

### 2. *The State Board's other guidance is unpersuasive*

As the foregoing demonstrates, Rule 462.180, subdivision (b)(2) does not support the trustees' argument that proportional ownership interests in corporate real property must be measured by voting stock. Cognizant of this analytical gap, the trustees rely heavily on interpretive materials published by the State Board long after Rule 462.180 was adopted. In deciding what deference, if any, to afford these materials, we consider several factors that bear on whether the agency's interpretation is likely to be correct: "indications of careful consideration by senior agency officials," "evidence that the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing,'" and "indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted." (*Yamaha, supra*, 19 Cal.4th at p. 13.)

In an amicus brief filed below, the State Board represented to the Court of Appeal that its interpretation of section 62(a)(2) was "consistent and longstanding." Like the trustees, the State Board pointed to Rule 462.180, which was promulgated in 1981, as a "contemporaneous" interpretation of the relevant statutes. As indicated, however, Rule 462.180 does not mention voting stock in connection with section 62(a)(2), and its examples refer only to "stock." We have been provided no State Board publication predating 2002 that can be read to interpret the reference to "stock" in section 62(a)(2) to mean "voting stock." The State Board's amicus brief in the Court of Appeal did not acknowledge, let alone attempt to explain, the failure of Rule 462.180 to refer to "voting stock" in this context. Thus, contrary to the State Board's representations below, it appears the interpretation found in its more recent materials is neither "consistent" nor "longstanding." It was certainly not made contemporaneously with the enactment of section 62(a)(2).

Of the materials cited by the trustees, the most salient is Section 401 of the Assessors' Handbook, a 2010 publication that discusses a variety of issues raised by sections 60 through 69.5.[6] (State Bd., Assessors' Handbook (2010) (Handbook) at p. ii.) As the State Board acknowledges in its "Hierarchy of

---

[6] The Assessors' Handbook consists of over 30 independent sections discussing various aspects of property appraisal and assessment. (See generally, Assessors' Handbook <https://www.boe.ca.gov/proptaxes/ahcont.htm> [as of May 30, 2024]; all Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.) Section 401 was approved by the State Board on September 15, 2010. (Handbook, *supra,* at p. ii; see https://www.boe.ca.gov/proptaxes/pdf/ah401.pdf.)

Property Tax Authorities," issued May 29, 2003, the "*Assessors'
Handbook* and other Board-approved publications do not have
the force of law"; they are "advisory only."  Under the general
heading "ownership of *legal entities*," the Handbook states that
"[f]or change in ownership purposes, ownership in a
corporation is determined by the percentage of ownership or
control of a corporation's voting stock." (Handbook, at p. 38,
italics added.)  The language and its placement within the
Handbook suggest it is meant to apply only to ownership
interests in legal entities, which corresponds to section 64, not
to ownership interests in real property as may be represented
by ownership interests in a legal entity, which would
correspond to section 62(a)(2).[7]  In any event, no authority is
cited in support of the proposition.

Later, in a section discussing the "proportional
ownership interest transfer exclusion," the Handbook
accurately states the statutory rule, essentially mirroring
section 62(a)(2)'s language:  "Any transfer of real property
between an individual or individuals and an entity, or between
legal entities, that results solely in a change in the method of
holding title to the real property, and in which the proportional
ownership interests of the transferors and transferees in each
and every piece of real property transferred remain the same

---

[7]     The Handbook generally acknowledges the distinction
between interests in real property and interests in legal
entities.  (See Handbook, *supra*, at p. 41 ["In general, there are
two types of transfers involving legal entities that may trigger
a change in ownership of real property. The first type is a
transfer of real property between an individual and an entity
or between entities. The second type is a transfer of an interest
in an entity."].)

after the transfer, is excluded from a change in ownership." (Handbook, *supra*, at p. 48.)  The Handbook contains the same examples contained in Rule 462.180, subdivision (b)(2). Example 2 under Rule 462.180, subdivision (b)(2), for instance, is included in the Handbook as Example 6-10.  Yet the references to "stock" in Example 2 of Rule 462.180, subdivision (b)(2), have been changed to "voting stock" in Example 6-10 of the Handbook.  (Handbook, at p. 49.)[8]  The Handbook contains no explanation for, or acknowledgment of, this change, nor is any authority cited to fill that void.  Notably, the example includes only a "single class of voting stock," with no mention of other classes of stock, voting or nonvoting.  Consequently, the example does not suggest that voting stock *alone* should be considered for purposes of section 62(a)(2).  For this reason, even if we accept that the Handbook reflects the State Board's interpretation of the meaning of the term "stock" in section 62(a)(2), it fails to persuade.  There is no indication that the State Board's new reference to voting stock was the product of a deliberative process, let alone that it received careful consideration by senior agency officials.

---

[8]     Example 6-10 from the Handbook states:  "D and B, equal co-tenants, transfer their real property to Corporation X and each take back 50 percent of the single class of voting stock.  No change in ownership occurs, since the proportional ownership interests remain the same before and after the transfer.  [¶]  However, if D and B each take back 49 percent of the voting stock and C receives 2 percent of the voting stock, there will be a change in ownership of the entire property since the proportional ownership interests did not remain the same before and after the transfer."  (Handbook, *supra*, at p. 49.)

The opinion letters cited by the trustees are similar in this respect — none directly address the question presented here and none appear to discuss a situation where a corporation had issued both voting and nonvoting stock.[9]  The State Board opinion letter regarding "Change of Ownership - Transfer from Revocable Trust to Corporation," issued May 31, 2007 to the Nevada County Assessor, for example, discusses "the transfer of real property from a husband and wife's revocable trust to a corporation owned 51 percent by the wife and 49 percent by the husband."  Although the letter, when analyzing section 62(a)(2)'s exclusion, later refers to "voting stock," there is no indication that either spouse also held nonvoting stock.  Like the Handbook, then, the letter does not suggest that voting stock *alone* should be considered for purposes of section 62(a)(2).  The State Board opinion letters regarding "Exchange, Transfer and Conversion of Interests in a Limited Partnership Owning Real Property," issued April 12, 2002, and "Request for Legal Opinion - BOE-100-B, Statement of Change in Control and Ownership of Legal Entities for

---

[9]     Summaries of the conclusions reached in selected opinion letters may be posted on the State Board's website as "[a]nnotations."  (Cal. Code Regs., tit. 18, § 5700, subd. (a)(1); *Yamaha, supra*, 19 Cal.4th at pp. 4–5; see State Board, Property Tax Annotations <https://www.boe.ca.gov/lawguides/ property/current/ptlg/annt/property-tax-annotations.htm> [as of May 30, 2024].)  Not all opinion letters "qualify for annotation."  (Cal. Code Regs., tit. 18, § 5700, subd. (b).)  It appears two of the opinion letters relied upon by the trustees were never annotated.  The other two — Annotations 220.0067 and 220.0267 — were previously posted but are now marked "(Deleted 2020)."  (See State Board, Property Tax Annotations, 220.0000 Change in Ownership <https://www.boe.ca.gov/lawguides/property/current/ptlg/annt/ 220-0000-all.html [as of May 30, 2024].)

[Redacted] & Subsidiaries Assignment No. 10-265," issued September 30, 2011, each contain a general statement that Rule 462.180, subdivision (d) defines "ownership interests" for purposes of sections 64 and 62(a)(2). These letters, however, address the transfer of partnership interests and a complex merger of affiliated corporations, respectively; the definition of "stock" in section 62(a)(2) does not dictate the result in either case. Again, there is no indication the general statements contained in these letters were the product of a deliberative process. They provide no rationale to support the assertion that Rule 462.180 subdivision (d) defines "ownership interests" for purposes of section 62(a)(2). Moreover, for the reasons discussed at length above, the statements conflict with our interpretation of section 62(a)(2) and the State Board's own implementing regulation; the letters do not acknowledge, much less explain, this disconnect. Accordingly, to the limited extent the opinion letters may reflect an interpretation of section 62(a)(2), they are unpersuasive and entitled to no deference.

### III. DISPOSITION

We affirm the judgment of the Court of Appeal.

**EVANS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Prang v. Los Angeles County Assessment Appeals Board

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 58 Cal.App.5th 246
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S266590
**Date Filed:**  May 30, 2024

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  James C. Chalfant

_____

**Counsel:**

Greenberg Traurig, Colin W. Fraser and Cris K. O'Neall for Real Party in Interest and Appellant.

McDermott Will & Emery and Charles J. Moll III for Charles J. Moll III as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Lamb and Kawakami, Renne Public Law Group, Thomas G. Kelch, Michael K. Slattery; Mary C. Wickham and Rodrigo A. Castro-Silva, County Counsel, Nicole Davis Tinkham and Peter M. Bollinger, Assistant County Counsel, Richard Girgado and Justin Y. Kim, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer B. Henning for California State Association of Counties and the California Assessors Association as Amici Curiae on behalf of Plaintiff and Respondent.

Ajalat, Polley, Ayoob & Matarese, Richard J. Ayoob, Christopher J. Matarese and Gregory R. Broege as Amicus Curiae.

Xavier Becerra, Attorney General, Tamar Pachter, Assistant Attorney General, Karen W. Yiu and Heather B. Hoesterey, Deputy Attorneys General, for California State Board of Equalization as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Colin W. Fraser
Greenberg Traurig, LLP
18565 Jamboree Road, Suite 500
Irvine, CA 92612
(949) 732-6663

Thomas G. Kelch
Renne Public Law Group
350 Sansome Street, Suite 300
San Francisco, CA 94104
(415) 848-7200